# UNITED STATES *v.* TRANS–MISSOURI FREIGHT ASSOCIATION.

APPEAL FROM. THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH. CIRCUIT.

No. 67. Argued December 8, 9, 1896. — Decided March 22, 1897.

The dissolution of the freight association does not prevent this court from taking cognizance of the appeal and deciding the case on its merits; as, where parties have entered into an illegal agreement and are acting under it, and there is no adequate remedy at law, and the jurisdiction of the court has attached by the filing of a bill to restrain such or like action under a similar agreement, and a trial has been had and judgment entered, the appellate jurisdiction of this court is not ousted by a simple dissolution of the association, effected subsequently to the entry of judgment in the suit.

While the statutory amount must as a matter of fact be in controversy, yet the fact that it is so need not appear in the bill, but may be shown to the satisfaction of the court.

The provisions respecting contracts, combinations and conspiracies in restraint of trade or commerce among the several States or with foreign countries, contained in the act of July 2, 1890, c. 647, " to protect trade and commerce against unlawful restraints and monopolies," apply to and cover common carriers by railroad; and a contract between them in restraint of such trade or commerce is prohibited, even though the contract is entered into between competing railroads, only for the purpose of thereby affecting traffic rates for the transportation of persons and property.

The act of February 4, 1887, c. 104, " to regulate commerce," is not incon-

sistent with the act of July 2, 1890, as it does not confer upon competing railroad companies power to enter into a contract in restraint of trade and commerce, like the one which forms the subject of this suit.

Debates in Congress are not appropriate sources of information, from which to discover the meaning of the language of a statute passed by that body.

The prohibitory provisions of the said act of July 2, 1890, apply to all contracts in restraint of interstate or foreign trade or commerce without exception or limitation; and are not confined to those in which the restraint is unreasonable.

In order to maintain this suit the government is not obliged to show that the agreement in question was entered into for the purpose of restraining trade or commerce, if such restraint is its necessary effect.

This agreement, though legal when made, became illegal on the passage of the act of July 2, 1890, and acts done under it after that statute became operative were done in violation of it.

The fourth section of the act invests the Government with full power and authority to bring such a suit as this; and, if the facts alleged are proved, an injunction should issue.

On the 2d of July, 1890, an act was passed by the Congress of the United States, entitled " An act to protect trade and commerce against unlawful restraints and monopolies."  26 Stat. 209, c. 647.   The act is given in full in the margin.[1]

---

[1] An act to protect trade and commerce against unlawful restraints and monopolies.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

SEC. 1. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal.   Every person who shall make any such contract or engage in any such combination or conspiracy, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.

SEC. 2. Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.

SEC. 3. Every contract, combination in form of trust or otherwise or conspiracy, in restraint of trade or commerce in any Territory of the United

On the 15th day of March, 1889, all but three of the defendants, the railway companies named in the bill, made and entered into an agreement by which they formed themselves into an association to be known as the "Trans-Missouri Freight Association," and they agreed to be governed by the provisions contained in the articles of agreement.

The memorandum of agreement entered into between the railway companies named therein, stated, among other things, as follows: "For the purpose of mutual protection by establishing and maintaining reasonable rates, rules and regulations on all freight traffic, both through and local, the subscribers do hereby form an association to be known as the Trans-Missouri Freight Association, and agree to be governed by the following provisions."

## "ARTICLE I.

"The traffic to be included in the Trans-Missouri Freight Association shall be as follows:

---

States or of the District of Columbia, or in restraint of trade or commerce between any such Territory and another, or between any such Territory or Territories and any State or States or the District of Columbia, or with foreign nations, or between the District of Columbia and any State or States or foreign nations, is hereby declared illegal. Every person who shall make any such contract or engage in any such combination or conspiracy, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.

SEC. 4. The several Circuit Courts of the United States are hereby invested with jurisdiction to prevent and restrain violations of this act; and it shall be the duty of the several district attorneys of the United States, in their respective districts, under the direction of the Attorney General, to institute proceedings in equity to prevent and restrain such violations. Such proceedings may be by way of petition setting forth the case and praying that such violation shall be enjoined or otherwise prohibited. When the parties complained of shall have been duly notified of such petition the court shall proceed, as soon as may be, to the hearing and determination of the case; and pending such petition and before final decree, the court may at any time make such temporary restraining order or prohibition as shall be deemed just in the premises.

SEC. 5. Whenever it shall appear to the court before which any proceed-

"1. All traffic competitive between any two or more members hereof, passing between points in the following described territory: Commencing at the Gulf of Mexico, on the 95th meridian, thence north to the Red River; thence via that river to the eastern boundary line of the Indian Territory; thence north by said boundary line and the eastern line of the State of Kansas to the Missouri River at Kansas City; thence via the said Missouri River to the point of intersection of that river with the eastern boundary of Montana; thence via the said eastern boundary line to the international line, — the foregoing to be known as the 'Missouri River line,' — thence via said international line to the Pacific coast; thence via the Pacific coast to the international line between the United States and Mexico; thence via said international line to the Gulf of Mexico, and thence via said gulf to the point of beginning, including business between points on the boundary line as described.

---

ing under section four of this act may be pending, that the ends of justice require that other parties should be brought before the court, the court may cause them to be summoned, whether they reside in the district in which the court is held or not; and subpœnas to that end may be served in any district by the marshal thereof.

Sec. 6. Any property owned under any contract or by any combination, or pursuant to any conspiracy (and being the subject thereof) mentioned in section one of this act, and being in the course of transportation from one State to another, or to a foreign country, shall be forfeited to the United States, and may be seized and condemned by like proceedings as those provided by law for the forfeiture, seizure and condemnation of property imported into the United States contrary to law.

Sec. 7. Any person who shall be injured in his business or property by any other person or corporation by reason of anything forbidden or declared to be unlawful by this act, may sue therefor in any Circuit Court of the United States in the district in which the defendant resides or is found, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the costs of suit, including a reasonable attorney's fee.

Sec. 8. That the word "person," or "persons," wherever used in this act shall be deemed to include corporations and associations existing under or authorized by the laws of either the United States, the laws of any of the Territories, the laws of any State, or the laws of any foreign country.

Approved, July 2, 1890.

"2. All freight traffic originating within the territory as defined in the first section when destined to points east of the aforesaid Missouri River line."

Certain exceptions to the above article are then stated as to the particular business of several railway companies, which was to be regarded as outside and beyond the provisions of the agreement.

Article II provided for the election of a chairman of the organization and for meetings at Kansas City, or otherwise, as might be provided for. By section 2 of that article each road was to "designate to the chairman one person who shall be held personally responsible for rates on that road. Such person shall be present at all regular meetings, when possible, and shall represent his road, unless a superior officer is present. If unable to attend he shall send a substitute with written authority to act upon all questions which may arise, and the vote of such substitute shall be binding upon the company he represents."

Section 3 provides that: "A committee shall be appointed to establish rates, rules and regulations on the traffic subject to this association, and to consider changes therein, and make rules for meeting the competition of outside lines. Their conclusions, when unanimous, shall be made effective when they so order, but if they differ the question at issue shall be referred to the managers of the lines parties hereto; and if they disagree it shall be arbitrated in the manner provided in article VII."

By section 4 it was provided that: "At least five days' written notice prior to each monthly meeting shall be given the chairman of any proposed reduction in rates or change in any rule or regulation governing freight traffic; eight days in so far as applicable to the traffic of Colorado or Utah."

Sections 5, 6, 7, 8, 9, 10 and 11 of article II read as follows:

"SEC. 5. At each monthly meeting the association shall consider and vote upon all changes proposed, of which due notice has been given, and all parties shall be bound by the decision of the association, as expressed, unless then and there

the parties shall give the association definite written notice that, in ten days thereafter, they shall make such modification notwithstanding the vote of the association : *Provided,* That if the member giving notice of change shall fail to be represented at the meeting, no action shall be taken on its notice, and the same shall be considered withdrawn. Should any member insist upon a reduction of rate against the views of the majority, or if the majority favor the same, and if, in the judgment of such majority, the rate so made affects seriously the rates upon other traffic, then the association may, by a majority vote, upon such other traffic put into effect corresponding rates to take effect on the same day. By unanimous consent, any rate, rule or regulation relating to freight traffic may be modified at any meeting of the association without previous notice.

" Sec. 6. Notwithstanding anything in this article contained, each member may, at its peril, make at any time, without previous notice, such rate, rule or regulations as may be necessary to meet the competition of lines not members of the association, giving at the same time notice to the chairman of its action in the premises. If the chairman, upon investigation, shall decide that such rate is not necessary to meet the direct competition of lines not members of the association, and shall so notify the road making the rate, it shall immediately withdraw such rate. At the next meeting of the association held after the making of such rate, it shall be reported to the association, and if the association shall decide by a two-thirds vote that such rate was not made in good faith to meet such competition, the member offending shall be subject to the penalty provided in section 8 of this article. If the association shall decide by a two-thirds vote that such rate was made in good faith to meet such competition, it shall be considered as authority for the rate so made.

" Sec. 7. All arrangements with connecting lines for the division of through rates relating to traffic covered by this agreement shall be made by authority of the association : *Provided, however,* That when one road has a proprietary interest in another, the divisions between such roads shall be

what they may elect, and shall not be the property of the association : *Provided, further*, That, as regards traffic contracts at this date actually existing between lines not having common proprietary interests, the same shall be reported, so far as divisions are concerned, to the association, to the end that divisions with competing lines may, if thought advisable by them, be made on equally favorable terms.

"SEC. 8. It shall be the duty of the chairman to investigate all apparent violations of the agreement, and to report his findings to the managers, who shall determine, by a majority vote (the member against whom complaint is made to have no vote), what, if any, penalty shall be assessed, the amount of each fine not to exceed one hundred dollars, to be paid to the association. If any line party hereto agrees with a shipper, or any one else, to secure a reduction or change in rates, or change in the rules and regulations, and it is shown upon investigation by the chairman that such an arrangement was effected, and traffic thereby secured, such action shall be reported to the managers, who shall determine, as above provided, what, if any, penalty shall be assessed.

"SEC. 9. When a penalty shall have been declared against any member of this association, the chairman shall notify the managing officer of said company that such fine has been assessed, and that within ten days thereafter he will draw for the amount of the fine; and the draft, when presented, shall be honored by the company thus assessed.

"SEC. 10. All fines collected to be used to defray the expenses of the association, the offending party not to be benefited by the amounts it may pay as fines.

"SEC. 11. Any member not present or fully represented at roll call of general or special meetings of the freight association, of which due and proper notice has been given, shall be fined one dollar, to be assessed against his company, unless he shall have previously filed with the chairman notice of inability to be present or represented."

Articles 3, 5, 6 and 7 contain appropriate provisions for the carrying out of the purposes of the agreement, but it is not necessary to here set them forth in detail.

Article IV reads as follows:

## "ARTICLE IV.

"Any wilful underbilling in weights, or billing of freight at wrong classification, shall be considered a violation of this agreement; and the rules and regulations of any weighing association or inspection bureau, as established by it or as enforced by its officers and agents, shall be considered binding under .the provisions of this agreement, and any wilful violation of them shall be subject to the penalties provided herein."

Article VIII provides that the agreement should take effect April 1, 1889, subject thereafter to thirty days' notice of a desire on the part of any line to withdraw from the same.

On the 6th of January, 1892, the United States, as complainant, filed in the Circuit Court of the United States for the District of Kansas, through the United States attorney for that district, and under the direction of the Attorney General of the United States, its bill of complaint against the Trans-Missouri Freight Association, named in the agreement above mentioned, the Atchison, Topeka and Santa Fé Railroad Company, and some seventeen other railroad companies, the officers of which had, it was alleged, signed the agreement above mentioned in behalf of and for their respective companies. The bill was filed by the Government for the purpose of having the agreement between the defendant railroad companies set aside and declared illegal and void, and to have the association dissolved.

It alleged that the defendant railroad corporations, signing the agreement, were at that time and ever since had been common carriers of all classes and kinds of freight and commodities which were commonly moved, carried and transported by railroad companies in their freight traffic, and at all such times had been, and then were, continuously engaged in transporting freight and commodities in the commerce, trade and traffic which is continuously carried on among and between the several States of the United States, and among

and between the several States and Territories of the United States, and between the people residing in, and all persons engaged in trade and commerce within and among and between, the States, Territories and countries aforesaid; that each of the defendants was, prior to the 15th day of March, 1889, the owner and in the control of, and that they were respectively operating and using, distinct and separate lines of railroad, fitted up for carrying on business as such carriers in the freight traffic above mentioned, independently and disconnectedly with each other, and that said lines of railroad had been and then were the only lines of transportation and communication engaged in the freight traffic between and among the States and Territories of the United States having through lines for said freight traffic in all that region of country lying to the westward of the Mississippi and Missouri rivers and east of the Pacific Ocean; that these lines of railroad furnish to the public and to persons engaged in trade and traffic and commerce between the several States and Territories and countries above mentioned separate, distinct and competitive lines of transportation and communication extending along and between the States and Territories of the United States lying westward of the Mississippi and Missouri rivers to the Pacific Ocean, and that the construction and maintenance of said several separate, distinct and competitive lines of railroad aforesaid had been encouraged and assisted by the United States and by the States and Territories in the region of country aforesaid, and by the people of the said several States and Territories, by franchises and by grants and donations of large amounts of land of great value, and of money and securities, for the purpose of securing to the public and to the people engaged in trade and commerce throughout the region of country aforesaid competitive lines of transportation and communication, and that prior to the 15th day of March, 1889, and subsequently and up to the present time, each and all of said defendants have been and are engaged as common carriers in the railway freight traffic connected with the interstate commerce of the United States.

It was then alleged in the bill as follows:

" And your orator further avers that on or about the fifteenth day of March, 1889, the defendants not being content with the usual rates and prices for which they and others were accustomed to move, carry and transport property, freight and commodities in the trade and commerce aforesaid and in their said business and occupation, but contriving and intending unjustly and oppressively to increase and augment the said rates and prices, and to counteract the effect of free competition on the facilities and prices of transportation, and to establish and maintain arbitrary rates, and to prevent any one of said defendants from reducing such arbitrary rates, and thereby exact and procure great sums of money from the people of the said States and Territories aforesaid, and from the people engaged in the interstate commerce, trade and traffic within the region of country aforesaid, and from all persons having goods, wares and merchandise to be transported by said railroads, and intending to monopolize the trade, traffic and commerce among and between the States and Territories aforesaid, did combine, conspire, confederate and unlawfully agree together, and did then and there enter into a written contract, combination, agreement and compact, known as a memorandum of agreement of the Trans-Missouri Freight Association, which was signed by each of said above-named defendants."

The bill then set forth the agreement signed by the various corporations defendant.

It was further alleged that the agreement went into effect on the 1st day of April, 1889, and that since that time each and all of the defendants, by reason of the agreement, have put into effect and kept in force upon the several lines of railroads the rules and regulations and rates and prices for moving, carrying and transporting freight fixed and established by the association, and have declined and refused to fix or establish and maintain or give on their railroads rates and prices for the carrying of freight based upon the cost of constructing and maintaining their several lines of railroad and the cost of carrying freights over the same, and such other elements as should be considered in establishing tariff rates upon each

particular road, and the people of the States and Territories subject to said association, and all persons engaged in trade and commerce within, among and between the different States and Territories had been compelled to and were still compelled to pay the arbitrary rates of freight and submit to the arbitrary rules and regulations established and maintained by the association, and ever since that date had been and still were deprived of the benefits that might be expected to flow from free competition between said several lines of transportation and communication, and were deprived of the better facilities and cheaper rates of freight that might be reasonably expected to flow from free competition between the lines above mentioned, and that the trade, traffic and commerce in such region of country, and the freight traffic in connection therewith, had been and were monopolized and restrained, hindered, injured and retarded by the defendants by means of and through the instrumentality of such association.

The bill further averred that notwithstanding the passage of the act of Congress above mentioned on the 2d day of July, 1890, the "defendants still continue in and still engage in said unlawful combination and conspiracy, and still maintain said Trans-Missouri Freight Association, with all the powers specified in the memorandum of agreement and articles of association hereinbefore set forth, which said agreement, combination and conspiracy so as aforesaid entered into and maintained by said defendants is of great injury and grievous prejudice to the common and public good and to the welfare of the people of the United States."

The prayer of the bill was as follows:

"In consideration whereof, and inasmuch as your orator can only have adequate relief in the premises in this honorable court where matters of this nature are properly cognizable and relievable, your orator prays that this honorable court may order, adjudge and decree that said Trans-Missouri Freight Association be dissolved, and that said defendants, and all and each of them, be enjoined and prohibited from further agreeing, combining and conspiring and acting together to maintain rules and regulations and rates for carry-

ing freight upon their several lines of railroad to hinder trade and commerce between the States and Territories of the United States, and that all and each of them be enjoined and prohibited from entering or continuing in a combination, association or conspiracy to deprive the people engaged in trade and commerce between and among the States and Territories of the United States of such facilities and rates and charges of freight transportation as will be afforded by free and unrestrained competition between the said several lines of railroad, and that all and each of said defendants be enjoined and prohibited from agreeing, combining and conspiring and acting together to monopolize or attempt to monopolize the freight traffic in the trade and commerce between the States and Territories of the United States, and that all and each of said defendants be enjoined and prohibited from agreeing, combining and conspiring and acting together to prevent each and any of their associates from carrying freight and commodities in the trade and commerce between the States and Territories of the United States at such rates as shall be voluntarily fixed by the officers and agents of each of said roads acting independently and separately in its own behalf."

The defendants were required to answer fully, etc., each and all of the matters charged in the bill, but such answer was not required to be under oath, an answer under oath being specially waived.

The Chicago, Kansas and Nebraska Railway Company, the Missouri, Kansas and Texas Railway Company and the Denver, Texas and Fort Worth Railroad Company denied being parties to the association. The other fifteen companies filed separate answers, each setting up substantially the same defence.

They admitted they were common carriers engaged in the transportation of persons and property in the States and Territories mentioned in the agreement, and they alleged that as such common carriers they were subject to the provisions of the act of Congress, approved February 4, 1887, c. 104, 24 Stat. 379, entitled " An act to regulate commerce," with the various amendments thereof and additions thereto,

and they alleged that that act and the amendments consti-
tuted a system of regulations established by Congress for
common carriers subject to the act, and they denied that they
were subject to the provisions of the act of Congress passed
July 2, 1890, above set forth.

They admit that they severally own, control and operate
separate and distinct lines of railroad constructed and fitted
for carrying on business as common carriers of freight, inde-
pendently and disconnectedly with each other; except that a
common interest exists between certain companies, named in
the answer. They admit that the lines of railroad mentioned
in the bill furnish lines of transportation and communication
to persons engaged in freight traffic between and among the
States and Territories of the United States, having through
lines for freight traffic in that region of country lying to the
westward of the Mississippi and Missouri rivers and east of
the Pacific Ocean, but deny that they are the only such lines,
and allege that there are several others, naming them.

They further admitted that prior to the organization of the
freight association the defendants furnished to the public and
to persons engaged in trade, traffic and commerce between
the several States and Territories named in the agreement,
separate, distinct and competitive lines of transportation and
communication, and they allege that they still continue to
do so.

They admitted that some of the roads mentioned in the
bill received aid by land grants from the United States, and
others received aid from States and Territories by loans of
credits, donations of depot sites and rights of way, and in a
few cases by investments of money, and that the people of
the States and Territories to a limited extent made invest-
ments in the stocks and bonds of some of the roads, while
others, mentioned in the bill, were almost exclusively con-
structed by capital furnished by non-residents of that region.

It was also admitted that the purpose of the land grants,
loans, donations and investments was to obtain the construc-
tion of competitive lines of transportation and communication
to the end that the public and the people engaged in trade

and commerce throughout that region of country might have facilities afforded by railways in communicating with each other and with other portions of the United States and the world, and denied that they were granted for any other purpose.

The defendants admitted the formation on or about March 15, 1889, of the voluntary association described in the bill as the " Trans-Missouri Freight Association."

They denied the allegation that they were not content with the rates and prices prevailing at the date of the agreement; they denied any intent to unjustly increase rates, and denied that the agreement destroyed, prevented or illegally limited or influenced competition; they denied that arbitrary rates were fixed or charged, or that rates had been increased, or that the effect of free competition had been counteracted; they denied any purpose in the formation of the association to monopolize trade, traffic and commerce between the States and Territories within the region mentioned in the bill; and they denied that the agreement was in any respect the illegal result of any unlawful confederation or conspiracy. The defendants alleged that the proper object of the association was to establish reasonable rates, rules and regulations on all freight traffic, and the maintenance of such rates until changed in the manner provided by law; that the agreement was filed with the Interstate Commerce Commission as required by section 6 of the act of February 4, 1887. They also alleged that it was not the purpose of the association to prevent the members from reducing rates or changing the rules and regulations fixed by the association; that by the terms of the agreement each member might do so, the preliminary requirement being that the proposed change should be voted upon at a meeting of the association, after which, if the proposal was not agreed to, the line making the proposal could make such reduced rate notwithstanding the objection of the other lines; that the purpose of this provision was to afford opportunity for the consideration of the reasonableness of any proposed rate, rule or regulation by all lines interested and an interchange of views on the effect of such

reduction, and that reductions of rates had been made in numerous instances through said process by the association. They admitted that the agreement took effect April 1, 1889, and that it had remained in operation since, and that the rates, rules and regulations fixed and established from time to time under said agreement had been put into effect and maintained in conformity to law; and it was denied that by reason of the agreement or under duress of fines and penalties, or otherwise, the defendants had refused to establish and maintain just and reasonable rates; and it was alleged that the object of the association at all times had been and was to establish all rates, rules and regulations upon a just and reasonable basis, and to avoid unjust discrimination and undue preference. They denied that shippers or the public were in any way oppressed or injured by reason of the rates fixed by the association, but on the contrary they alleged that the agreement and the association established under it had been beneficial to the patrons of the railway lines composing the association and the public at large. These in substance were the allegations in the various answers.

The cause came on for hearing on bill and answer before the Circuit Court of the United States for the District of Kansas, First Division. That court dismissed the bill without costs against the complainant. 53 Fed. Rep. 440. The Government duly appealed from the judgment to the United States Circuit Court of Appeals for the Eighth Circuit, and that court after argument affirmed, in October, 1893, the judgment of the Circuit Court, without costs, Shiras, District Judge, dissenting. 19 U. S. App. 36. From that judgment the Government appealed to this court.

A motion was made upon affidavits to dismiss the appeal. The affidavits show that on the 18th of November, 1892, a resolution was adopted by the Trans-Missouri Freight Association, one of the defendants, providing that the organization should be discontinued from and after the 19th of November, 1892, and the secretary was instructed to wind up its affairs at as early a date as possible. It further appeared by the affidavits that the Trans-Missouri Freight Association was

actually dissolved and its existence ended on the above date, November 19, 1892, and that it has not since that date been revived, nor has it since that date had any activity of any kind, "and that it has not conducted or been engaged in any operations or business whatever, but that it has been dead and out of existence."

It also alleged as another ground for dismissing the appeal that the matter in controversy does not exceed $1000, and that the case does not come under any other provision of the act of 1891, allowing an appeal from the Circuit Courts of Appeals to this court. In opposition to the motion it appeared upon the part of the appellant that at the same meeting at which the resolution above referred to was adopted, the following resolution was also adopted : "*Resolved*, That a committee of seven be appointed by the chairman of this meeting to draw up a new agreement for the conduct of business now substantially covered by the Trans-Missouri agreement and to make a report to all lines in the Trans-Missouri Association at a meeting to be called in Chicago on December 6, 1892." A committee of seven was accordingly appointed, which adopted a resolution calling a meeting for the 6th of December, 1892, of the lines formerly members of the Trans-Missouri Association and representatives of other interested lines for the purpose of considering any changes in the tariffs and of business which was under the jurisdiction of that association and which might be submitted to the parties at that time, and to further consider the organization of one or more rate committees to govern the manner of making rates on such traffic until some permanent organization could be effected. In the early days of December, 1892, the meeting so called was held and was participated in by most of the railroad companies which were parties to the Trans-Missouri agreement, and at that meeting an agreement was made upon the subject of rates of freight, and a West-Missouri freight rate committee was appointed, the duties of which committee were to establish and maintain reasonable rates in the territory described, and other lines not therein represented but interested in the freight traffic of such territory were to be invited to become members. A plan for

the establishment of sub-rate committees for the purpose of agreeing upon rates was therein set forth and agreed to. The agreement was to become effective on the 1st of January, 1892, and to remain in force until the following April, during which time it was supposed that a new and permanent association to provide for an agreement relating to rates of freight might be founded. It does not appear whether such permanent association has been formed or that the temporary agreement has been actually terminated.

In answer to the motion to dismiss on the ground that the matter in controversy did not amount to over a thousand dollars, the parties have stipulated as follows: "It is hereby stipulated for the purposes of this case and no other, and without waiving any right to question the legal effect of such fact, that the daily freight charges on interstate shipments collected by all the railway companies at points where they compete with each other were, at the time of the agreement mentioned in the pleadings herein, and have been since, more than one thousand dollars."

To the motion made to dismiss the appeal for want of jurisdiction, briefs were filed as follows :

*Mr. W. F. Guthrie* filed a brief on behalf of the Burlington and Missouri River Railroad Company in support of the motion.

*Mr. Lloyd W. Bowers* filed a brief on behalf of the Atchison, Topeka and Santa Fé Railroad Company, the Chicago, Rock Island and Pacific Railroad Company, the Fremont, Elkhorn and Missouri Valley Railroad Company, The Sioux City and Pacific Railroad Company and the Chicago, St. Paul, Minneapolis and Omaha Railway Company in support of the motion.

*Mr. Attorney General* and *Mr. Assistant Attorney General Whitney* for the United States filed a brief opposing the motion.

At the hearing on the merits one hour additional time was, on motion of *Mr. Dillon*, allowed to each side.

*Mr. Attorney General* for the United States, appellants.

*Mr. John F. Dillon* for the Freight Association, appellees. *Mr. A. L. Williams*, *Mr. Harry Hubbard* and *Mr. John M. Dillon* were on his brief.

*Mr. James C. Carter* for the Freight Association, appellees.

*Mr. E. J. Phelps* for the Freight Association and the New York Central and Hudson River Railroad Company, appellees.

*Mr. Attorney General* concluded for appellants.

*Mr. W. F. Guthrie* filed a brief on behalf of the Burlington and Missouri River Railroad Company.

*Mr. Lloyd W. Bowers* filed a brief for the Fremont, Elkhorn and Missouri Valley Railroad Company and the Sioux City and Pacific Railroad Company.

MR. JUSTICE PECKHAM, after stating the facts, delivered the opinion of the court.

The defendants object to the hearing of this appeal, and ask that it be dismissed on the ground that the Trans-Missouri Freight Association has been dissolved by a vote of its members since the judgment entered in this suit in the court below. A further ground urged for the dismissal of the appeal is that the requisite amount (over one thousand dollars) is not in controversy in the suit, and that as an appeal would only lie to this court in this character of suit under the act of March 3, 1891, c. 517, 28 Stat. 826, where that amount is in controversy, the appeal should be dismissed.

As to the first ground, we think the fact of the dissolution of the association does not prevent this court from taking cognizance of the appeal and deciding the case upon its merits.

The prayer of the bill filed in this suit asks not only for the dissolution of the association, but, among other things, that the defendants should be restrained from continuing in a like combination, and that they should be enjoined from further conspiring, agreeing or combining and acting together to maintain rules and regulations and rates for carrying freight upon their several lines, etc. The mere dissolution of the association is not the most important object of this litigation. The judgment of the court is sought upon the question of the legality of the agreement itself for the carrying out of which the association was formed, and if such agreement be declared to be illegal, the court is asked not only to dissolve the association named in the bill, but that the defendants should be enjoined for the future.

The defendants, in bringing to the notice of the court the fact of the dissolution of the association, take pains to show that such dissolution had no connection or relation whatever with the pendency of this suit, and that the association was not terminated on that account. They do not admit the illegality of the agreement, nor do they allege their purpose not to enter into a similar one in the immediate future. On the contrary, by their answers the defendants claim that the agreement is a perfectly proper, legitimate and salutary one, and that it or one like it is necessary to the prosperity of the companies. If the injunction were limited to the prevention of any action by the defendants under the particular agreement set out, or if the judgment were to be limited to the dissolution of the association mentioned in the bill, the relief obtained would be totally inadequate to the necessities of the occasion, provided an agreement of that nature were determined to be illegal. The injunction should go further, and enjoin defendants from entering into or acting under any similar agreement in the future. In other words, the relief granted should be adequate to the occasion.

As an answer to the fact of the dissolution of the association, it is shown on the part of the Government that these very defendants, or most of them, immediately entered into a substantially similar agreement, which was to remain in force for

a certain time, and under which the companies acted, and in regard to which it does not appear that they are not still acting. If the mere dissolution of the association worked an abatement of the suit as to all the defendants, as is the claim made on their part, it is plain that they have thus discovered an effectual means to prevent the judgment of this court being given upon the question really involved in the case. The defendants having succeeded in the court below, it would only be necessary thereafter to dissolve their association and instantly form another of a similar kind, and the fact of the dissolution would prevent an appeal to this court or procure its dismissal if taken. This result does not and ought not to follow. Although the general rule is that equity does not interfere simply to restrain a possible future violation of law, yet where parties have entered into an illegal agreement and are acting under it, and there is no adequate remedy at law and the jurisdiction of the court has attached by the filing of a bill to restrain such or any like action under a similar agreement, and a trial has been had, and judgment entered, the appellate jurisdiction of this court is not ousted by a simple dissolution of the association, effected subsequently to the entry of judgment in the suit.

Private parties may settle their controversies at any time, and rights which a plaintiff may have had at the time of the commencement of the action may terminate before judgment is obtained or while the case is on appeal, and in any such case the court, being informed of the facts, will proceed no further in the action. Here, however, there has been no extinguishment of the rights (whatever they are) of the public, the enforcement of which the Government has endeavored to procure by a judgment of a court under the provisions of the act of Congress above cited. The defendants cannot foreclose those rights nor prevent the assertion thereof by the Government as a substantial trustee for the public under the act of Congress, by any such action as has been taken in this case. By designating the agreement in question as illegal and the alleged combination as an unlawful one, we simply mean to say that such is the character of the agreement as claimed by

the Government. That question the Government has the right to bring before the court and obtain its judgment thereon. Whether the agreement is of that character is the question herein to be decided.

We think, therefore, the first ground urged by defendants for the dismissal of the appeal is untenable.

We have no difficulty either in sustaining the jurisdiction of this court in regard to the second ground, that of the amount in controversy in the suit.

The bill need not state, in so many words, that a certain amount exceeding one thousand dollars is in controversy in order that this court may have jurisdiction on appeal. The statutory amount must as a matter of fact be in controversy, yet that fact may appear by affidavit after the appeal is taken to this court, *Whiteside* v. *Haselton*, 110 U. S. 296; *Red River Cattle Co.* v. *Needham*, 137 U. S. 632, or it may be made to appear in such other manner as shall establish it to the satisfaction of the court. A stipulation between the parties as to the amount is not controlling, but in the discretion of the court it may be regarded in a particular case, and with reference to the other facts appearing in the record as sufficient proof of the amount in controversy to sustain the jurisdiction of this court.

The bill shows here an agreement entered into (as stated in the agreement itself) for the purpose of maintaining reasonable rates to be received by each company executing the agreement, and the stipulation entered into between the parties hereto shows that the daily freight charges on interstate shipments collected by the railway companies at points where they compete with each other were, at the time of the making of the agreement mentioned in the pleadings herein and have been since, more than one thousand dollars. This agreement so made, the Government alleges, is illegal as being in restraint of trade, and was entered into between the companies for the purpose of enhancing the freight rates. The companies, while denying the illegality of the agreement or its purpose to be other than to maintain reasonable rates, yet allege that without some such agreement the competition between them for

traffic would be so severe as to cause great losses to each defendant and possibly ruin the companies represented in the agreement. Such a result, it is claimed, is avoided by reason of the agreement. Upon the existence, therefore, of this .or some similar agreement directly depends (as is alleged) the prosperity, if not the life, of each company. It must follow that an amount much more than a thousand dollars is involved in the maintenance of the agreement or in the right to maintain it or something like it. These facts, appearing in the record and the stipulation, show that the right involved is a right which is of the requisite pecuniary value. A reduction of the rates by only the fractional part of one per centum would, in the aggregate, amount to over a thousand dollars in a very few days. This is.sufficient to give the court jurisdiction on appeal. *South Carolina* v. *Seymour*, 153 U. S. 353, 357. There is directly involved in this suit the validity and the life of this agreement, or one similar to it. Out of this agreement directly springs the ability as well as the right to maintain these rates, and each company is interested in maintaining the validity of the agreement to the same extent as all the others. As against the agreement the Government represents the interest of the public, and thus the parties stand opposed to each other — the one in favor of dissolving and the other of maintaining the agreement.

Unlike the case of *Gibson* v. *Shufeldt*, 122 U. S. 27, and the cases therein cited in the opinion of the court delivered by Mr. Justice Gray, the defendants here are jointly interested in the question, and it is not the case of a fund amounting to more than the requisite sum which is to be paid to different parties in sums less than the jurisdictional amount.

For the reasons above stated, we .think the jurisdictional fact in regard to each defendant appears plainly and necessarily from the record and the stipulation, and that the duty is thus laid upon this court to entertain the appeal.

Coming to the merits of the suit, there are two important questions which demand our examination. They are, first, whether the above-cited act of Congress (called herein the Trust Act) applies to and covers common carriers by railroad;

and, if so, second, does the agreement set forth in the bill violate any provision of that act?

As to the first question:

The language of the act includes *every* contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States or with foreign nations. So far as the very terms of the statute go, they apply to any contract of the nature described. A contract therefore that is in restraint of trade or commerce is by the strict language of the act prohibited even though such contract is entered into between competing common carriers by railroad, and only for the purposes of thereby affecting traffic rates for the transportation of persons and property. If such an agreement restrain trade or commerce, it is prohibited by the statute, unless it can be said that an agreement, no matter what its terms, relating only to transportation cannot restrain trade or commerce. We see no escape from the conclusion that if any agreement of such a nature does restrain it, the agreement is condemned by this act. It cannot be denied that those who are engaged in the transportation of persons or property from one State to another are engaged in interstate commerce, and it would seem to follow that if such persons enter into agreements between themselves in regard to the compensation to be secured from the owners of the articles transported, such agreement would at least relate to the business of commerce, and might more or less restrain it. The point urged on the defendants' part is that the statute was not really intended to reach that kind of an agreement relating only to traffic rates entered into by competing common carriers by railroad; that it was intended to reach only those who were engaged in the manufacture or sale of articles of commerce, and who by means of trusts, combinations and conspiracies were engaged in affecting the supply or the price or the place of manufacture of such articles. The terms of the act do not bear out such construction. Railroad companies are instruments of commerce, and their business is commerce itself. *State Freight Tax case,* 15 Wall. 232, 275; *Telegraph Co.* v. *Texas,* 105 U. S. 460, 464.

An act which prohibits the making of every contract, etc., in restraint of trade or commerce among the several States, would seem to cover by such language a contract between competing railroads, and relating to traffic rates for the transportation of articles of commerce between the States, provided such contract by its direct effect produces a restraint of trade or commerce. What amounts to a restraint within the meaning of the act if thus construed need not now be discussed.

We have held that the Trust Act did not apply to a company engaged in one State in the refining of sugar under the circumstances detailed in the case of *United States* v. *E. C. Knight Company,* 156 U. S. 1, because the refining of sugar under those circumstances bore no distinct relation to commerce between the States or with foreign nations. To exclude agreements as to rates by competing railroads for the transportation of articles of commerce between the States would leave little for the act to take effect upon.

Nor do we think that because the sixth section does not forfeit the property of the railroad company when merely engaged in the transportation of property owned under and which was the subject of a contract or combination mentioned in the first section, any ground is shown for holding the rest of the act inapplicable to carriers by railroad. It is not perceived why, if the rest of the act were intended to apply to such a carrier, the sixth section ought necessarily to have provided for the seizure and condemnation of the locomotives and cars of the carrier engaged in the transportation between the States of those articles of commerce owned as stated in that sixth section. There is some justice and propriety in forfeiting those articles, but we see none in forfeiting the locomotives or cars of the carrier simply because such carrier was transporting articles as described from one State to another, even though the carrier knew that they had been manufactured or sold under a contract or combination in violation of the act. In the case of a simple transportation of such articles the carrier would be guilty of no violation of any of the provisions of the act. Why, there-

fore, would it follow that the sixth section should provide
for the forfeiture of the property of the carrier if the rest
of the act were intended to apply to it?  To subject the
locomotives and cars to forfeiture under such circumstances
might also cause great confusion to the general business of
the carrier and in that way inflict unmerited punishment
upon the innocent owners of other property in the course
of transportation in the same cars and drawn by the same
locomotives.    If the company itself violates the act, the
penalties are sufficient as provided for therein.

   But it is maintained that an agreement like the one in ques-
tion on the part of the railroad companies is authorized by
the Commerce Act, which is a special statute applicable only
to railroads, and that a construction of the Trust Act (which
is a general act) so as to include within its provisions the case
of railroads, carries with it the repeal by implication of so
much of the Commerce Act as authorized the agreement.
It is added that there is no language in the Trust Act which
is sufficiently plain to indicate a purpose to repeal those pro-
visions of the Commerce Act which permit the agreement;
that both acts may stand, the special or Commerce Act as
relating solely to railroads and their proper regulation and
management, while the later and general act will apply to
all contracts of the nature therein described, entered into
by any one other than competing common carriers by rail-
road for the purpose of establishing rates of traffic for trans-
portation.  On a line with this reasoning it is said that if
Congress had intended to in any manner affect the railroad
carrier as governed by the Commerce Act, it would have
amended that act directly and in terms, and not have left
it as a question of construction to be determined whether
so important a change in the commerce statute had been ac-
complished by the passage of the statute relating to trusts.

   The first answer to this argument is that, in our opinion,
the Commerce Act does not authorize an agreement of this
nature.  It may not in terms prohibit, but it is far from
conferring either directly or by implication any authority
to make it.  If the agreement be legal it does not owe its

validity to any provision of the Commerce Act, and if illegal it is not made so by that act. The fifth section prohibits what is termed "pooling," but there is no express provision in the act prohibiting the maintenance of traffic rates among competing roads by making such an agreement as this, nor is there a v provision which permits it. Prior to the passage of the act the companies had sometimes endeavored to regulate competition and to maintain rates by pooling arrangements, and in the act that kind of an arrangement was forbidden. After its passage other devices were resorted to for the purpose of curbing competition and maintaining rates. The general nature of a contract like the one before us is not mentioned in or provided for by the act. The provisions of that act look to the prevention of discrimination, to the furnishing of equal facilities for the interchange of traffic, to the rate of compensation for what is termed the long and the short haul, to the attainment of a continuous passage from the point of shipment to the point of destination, at a known and published schedule, and, in the language of counsel for defendants, "without reference to the location of those points or the lines over which it is necessary for the traffic to pass," to procuring uniformity of rates charged by each company to its patrons, and to other objects of a similar nature. The act was not directed to the securing of uniformity of rates to be charged by competing companies, nor was there any provision therein as to a maximum or minimum of rates. Competing and non-connecting roads are not authorized by this statute to make an agreement like this one.

As the Commerce Act does not authorize this agreement, argument against a repeal by implication, of the provisions of the act which it is alleged grant such authority, becomes ineffective. There is no repeal in the case, and both statutes may stand, as neither is inconsistent with the other.

It is plain, also, that an amendment of the Commerce Act would not be an appropriate method of enacting the legislation contained in the Trust Act, for the reason that the latter act includes other subjects in addition to the contracts of or combinations among railroads, and is addressed to the

prohibition of other contracts besides those relating to transportation. The omission, therefore, to amend the Commerce Act furnishes no reason for claiming that the later statute does not apply to railroad transportation. Although the commerce statute may be described as a general code for the regulation and government of railroads upon the subjects treated of therein, it cannot be contended that it furnishes a complete and perfect set of rules and regulations which are to govern them in all cases, and that any subsequent act in relation to them must, when passed, in effect amend or repeal some provision of that statute. The statute does not cover all cases concerning transportation by railroad and all contracts relating thereto. It does not purport to cover such an extensive field.

The existence of agreements similar to this one may have been known to Congress at the time it passed the Commerce Act, although we are not aware, from the record, that an agreement of this kind had ever been made and publicly known prior to the passage of the Commerce Act. Yet if it had been known to Congress, its omission to prohibit it at that time, while prohibiting the pooling arrangements, is no reason for assuming that when passing the Trust Act it meant to except all contracts of railroad companies in regard to traffic rates from the operation of such act. Congress for its own reasons, even if aware of the existence of such agreements, did not see fit when it passed the Commerce Act to prohibit them with regard to railroad companies alone, and the act was not an appropriate place for general legislation on the subject. And at that time, and for several years thereafter, Congress did not think proper to legislate upon the subject at all. Finally it passed this Trust Act, and in our opinion no obstacle to its application to contracts relating to transportation by railroads is to be found in the fact that the Commerce Act had been passed several years before, in which the entering into such agreements was not in terms prohibited.

It is also urged that the debates in Congress show beyond a doubt that the act as passed does not include railroads. Coun-

sel for the defendants refer in considerable detail to its history from the time of its introduction in the Senate to its final passage. As the act originally passed the Senate the first section was in substance as it stands at present in the statute. On its receipt by the House that body proposed an amendment, by which it was in terms made unlawful to enter into any contract for the purpose of preventing competition in the transportation of persons or property. As thus amended the bill went back to the Senate, which itself amended the amendment by making the act apply to any such contract as tended to raise prices for transportation above what was just and reasonable. This amendment by the Senate of the amendment proposed by the House was disagreed to by that body. The amendments were then considered by conference committees, and the first conference committee reported to each house in favor of the amendment of the Senate. This report was disagreed to and another committee appointed, which agreed to strike out both amendments and leave the bill as it stood when it first passed the Senate, and that report was finally adopted, and the bill thus passed.

Looking at the debates during the various times when the bill was before the Senate and the House, both on its original passage by the Senate and upon the report from the conference committees, it is seen that various views were declared in regard to the legal import of the act. Some of the members of the House wanted it placed beyond doubt or cavil that contracts in relation to the transportation of persons and property were included in the bill. Some thought the amendment unnecessary as the language of the act already covered it, and some refused to vote for the amendment or for the bill if the amendments were adopted on the ground that it would then interfere with the Interstate Commerce Act, and tend to create confusion as to the meaning of each act. Senator Hoar (who was a member of the first committee of conference from the Senate), when reporting the result arrived at by the judiciary committee recommending the adoption of the House amendment, said: "The other clause of the House amendment is that contracts or agreements entered into for the purpose of

preventing competition in the transportation of persons or property from one State or Territory into another shall be deemed unlawful. That, the committee recommend shall be concurred in. *We suppose that it is already covered by the bill as it stands;* that is, that transportation is as much trade or commerce among the several States as the sale of goods in one State to be delivered in another, and, therefore, that it is covered already by the bill as it stands. But there is no harm in agreeing in an amendment which expressly describes it, and an objection to the amendment might be construed as if the Senate did not mean to include it; so we let it stand."

Looking simply at the history of the bill from the time it was introduced in the Senate until it was finally passed, it would be impossible to say what were the views of a majority of the members of each house in relation to the meaning of the act. It cannot be said that a majority of both houses did not agree with Senator Hoar in his views as to the construction to be given to the act as it passed the Senate. All that can be determined from the debates and reports is that various members had various views, and we are left to determine the meaning of this act, as we determine the meaning of other acts, from the language used therein.

There is, too, a general acquiescence in the doctrine that debates in Congress are not appropriate sources of information from which to discover the meaning of the language of a statute passed by that body. *United States* v. *Union Pacific Railroad Company*, 91 U. S. 72, 79; *Aldridge* v. *Williams*, 3 How. 9, 24, Taney, Chief Justice; *Mitchell* v. *Great Works Milling & Manufacturing Company*, 2 Story, 648, 653; *Queen* v. *Hertford College*, 3 Q. B. D. 693, 707.

The reason is that it is impossible to determine with certainty what construction was put upon an act by the members of a legislative body that passed it by resorting to the speeches of individual members thereof. Those who did not speak may not have agreed with those who did; and those who spoke might differ from each other; the result being that the only proper way to construe a legislative act is from the language used in the act, and, upon occasion, by a resort

to the history of the times when it was passed. (Cases cited, *supra.*) If such resort be had, we are still unable to see that the railroads were not intended to be included in this legislation.

It is said that Congress had very different matters in view and very different objects to accomplish in the passage of the act in question; that a number of combinations in the form of trusts and conspiracies in restraint of trade were to be found throughout the country, and that it was impossible for the state governments to successfully cope with them because of their commercial character and of their business extension through the different States of the Union. Among these trusts it was said in Congress were the Beef Trust, the Standard Oil Trust, the Steel Trust, the Barbed Fence Wire Trust, the Sugar Trust, the Cordage Trust, the Cotton Seed Oil Trust, the Whiskey Trust and many others, and these trusts it was stated had assumed an importance and had acquired a power which were dangerous to the whole country, and that their existence was directly antagonistic to its peace and prosperity. To combinations and conspiracies of this kind it is contended that the act in question was directed, and not to the combinations of competing railroads to keep up their prices to a reasonable sum for the transportation of persons and property. It is true that many and various trusts were in existence at the time of the passage of the act, and it was probably sought to cover them by the provisions of the act. Many of them had rendered themselves offensive by the manner in which they exercised the great power that combined capital gave them. But a further investigation of "the history of the times" shows also that those trusts were not the only associations controlling a great combination of capital which had caused complaint at the manner in which their business was conducted. There were many and loud complaints from some portions of the public regarding the railroads and the prices they were charging for the service they rendered, and it was alleged that the prices for the transportation of persons and articles of commerce were unduly and improperly enhanced by combinations among the different

roads. Whether these complaints were well or ill founded we do not presume at this time and under these circumstances to determine or to discuss. It is simply for the purpose of answering the statement that it was only to trusts of the nature above set forth that this legislation was directed, that the subject of the opinions of the people in regard to the actions of the railroad companies in this particular is referred to. A reference to this history of the times does not, as we think, furnish us with any strong reason for believing that it was only trusts that were in the minds of the members of Congress, and that railroads and their manner of doing business were wholly excluded therefrom.

Our attention is also called to one of the rules for the construction of statutes which has been approved by this court; that while it is the duty of courts to ascertain the meaning of the legislature from the words used in the statute and the subject-matter to which it relates, there is an equal duty to restrict the meaning of general words, whenever it is found necessary to do so in order to carry out the legislative intent. *Brewer* v. *Blougher*, 14 Pet. 178, 198; *Petri* v. *Commercial Bank of Chicago*, 142 U. S. 644, 650; *McKee* v. *United States*, 164 U. S. 287. It is therefore urged that if, by a strict construction of the language of this statute it may be made to include railroads, yet it is evident from other considerations now to be mentioned that the real meaning of the legislature would not include them, and they must for that reason be excluded. It is said that this meaning is plainly to be inferred, because of fundamental differences both in an economic way and before the law between trade and manufacture on the one hand, and railroad transportation on the other. Among these differences are the public character of railroad business, and as a result the peculiar power of control and regulation possessed by the State over railroad companies. The trader or manufacturer, on the other hand, carries on an entirely private business, and can sell to whom he pleases; he may charge different prices for the same article to different individuals; he may charge as much as he can get for the article in which he deals, whether the price be reasonable or

unreasonable; he may make such discrimination in his business as he chooses, and he may cease to do any business whenever his choice lies in that direction; while, on the contrary, a railroad company must transport all persons and property that come to it, and it must do so at the same price for the same service, and the price must be reasonable, and it cannot at its will discontinue its business. It is also urged that there are evils arising from unrestricted competition in regard to railroads which do not exist in regard to any other kind of property, that it is so admitted by the latest and best writers on the subject, and that practical experience of the results of unrestricted competition among railroads tends directly to the same view; that the difference between railroad property on the one hand, and all other kinds of property on the other hand, is so plain that entirely different economic results follow from unrestricted competition among railroads from those which obtain in regard to all other kinds of business. It is also said that the contemporaneous industrial history of the country, the legal situation in regard to railroad properties at the time of the enactment of this statute, its legislative history, the ancient and constantly maintained different legal effect and policy regarding railway transportation and ordinary trade and manufacture, together with a just regard for interests of such enormous magnitude as are represented by the railroads of the country, all tend to show that Congress in passing the Anti-Trust Act never could have contemplated the inclusion of railroads within its provisions. It is, therefore, claimed to be the duty of the court, in carrying out the rule of statutory construction, above stated, to restrict the meaning of these general words of the statute which would include railroads, because, from the considerations above mentioned, it is plain that Congress never intended that railroads should be included.

Many of the foregoing assertions may be well founded, while at the same time the correctness of the conclusions sought to be drawn therefrom need not be conceded. The points of difference between the railroad and other corporations are many and great. It cannot be disputed that a railroad

is a public corporation, and its business pertains to and greatly affects the public, and that it is of a public nature. The company may not charge unreasonable prices for transportation, nor can it make unjust discriminations, nor select its patrons, nor go out of business when it chooses, while a mere trading or manufacturing company may do all these things. But the very fact of the public character of a railroad would itself seem to call for special care by the legislature in regard to its conduct, so that its business should be carried on with as much reference to the proper and fair interests of the public as possible. While the points of difference just mentioned and others do exist between the two classes of corporations, it must be remembered they have also some points of resemblance. Trading, manufacturing and railroad corporations are all engaged in the transaction of business with regard to articles of trade and commerce, each in its special sphere, either in manufacturing or trading in commodities or in their transportation by rail. A contract among those engaged in the latter business by which the prices for the transportation of commodities traded in or manufactured by the others is greatly enhanced from what it otherwise would be if free competition were the rule, affects and to a certain extent restricts trade and commerce, and affects the price of the commodity. Of this there can be no question. Manufacturing or trading companies may also affect prices by joining together in forming a trust or other combination, and by making agreements in restraint of trade and commerce, which when carried out affect the interests of the public. Why should not a railroad company be included in general legislation aimed at the prevention of that kind of agreement made in restraint of trade, which may exist in all companies, which is substantially of the same nature wherever found, and which tends very much towards the same results, whether put in practice by a trading and manufacturing or by a railroad company? It is true the results of trusts, or combinations of that nature, may be different in different kinds of corporations, and yet they all have an essential similarity, and have been induced by motives of individual or corporate aggran-

dizement as against the public interest. In business or trading combinations they may even temporarily, or perhaps permanently, reduce the price of the article traded in or manufactured, by reducing the expense inseparable from the running of many different companies for the same purpose. Trade or commerce under those circumstances may nevertheless be badly and unfortunately restrained by driving out of business the small dealers and worthy men whose lives have been spent therein, and who might be unable to readjust themselves to their altered surroundings. Mere reduction in the price of the commodity dealt in might be dearly paid for by the ruin of such a class, and the absorption of control over one commodity by an all-powerful combination of capital. In any great and extended change in the manner or method of doing business it seems to be an inevitable necessity that distress and, perhaps, ruin shall be its accompaniment in regard to some of those who were engaged in the old methods. A change from stage coaches and canal boats to railroads threw at once a large number of men out of employment; changes from hand labor to that of machinery, and from operating machinery by hand to the application of steam for such purpose, leave behind them for the time a number of men who must seek other avenues of livelihood. These are misfortunes which seem to be the necessary accompaniment of all great industrial changes. It takes time to effect a readjustment of industrial life so that those who are thrown out of their old employment, by reason of such changes as we have spoken of, may find opportunities for labor in other departments than those to which they have been accustomed. It is a misfortune, but yet in such cases it seems to be the inevitable accompaniment of change and improvement.

It is wholly different, however, when such changes are effected by combinations of capital, whose purpose in combining is to control the production or manufacture of any particular article in the market, and by such control dictate the price at which the article shall be sold, the effect being to drive out of business all the small dealers in the commodity and to render the public subject to the decision of the com-

bination as to what price shall be paid for the article. In this light it is not material that the price of an article may be lowered. It is in the power of the combination to raise it, and the result in any event is unfortunate for the country by depriving it of the services of a large number of small but independent dealers who were familiar with the business and who had spent their lives in it, and who supported themselves and their families from the small profits realized therein. Whether they be able to find other avenues to earn their livelihood is not so material, because it is not for the real prosperity of any country that such changes should occur which result in transferring an independent business man, the head of his establishment, small though it might be, into a mere servant or agent of a corporation for selling the commodities which he once manufactured or dealt in, having no voice in shaping the business policy of the company and bound to obey orders issued by others. Nor is it for the substantial interests of the country that any one commodity should be within the sole power and subject to the sole will of one powerful combination of capital. Congress has, so far as its jurisdiction extends, prohibited all contracts or combinations in the form of trusts entered into for the purpose of restraining trade and commerce. The results naturally flowing from a contract or combination in restraint of trade or commerce, when entered into by a manufacturing or trading company such as above stated, while differing somewhat from those which may follow a contract to keep up transportation rates by railroads, are nevertheless of the same nature and kind, and the contracts themselves do not so far differ in their nature that they may not all be treated alike and be condemned in common. It is entirely appropriate generally to subject corporations or persons engaged in trading or manufacturing to different rules from those applicable to railroads in their transportation business; but when the evil to be remedied is similar in both kinds of corporations, such as contracts which are unquestionably in restraint of trade, we see no reason why similar rules should not be promulgated in regard to both, and both be covered in the same

statute by general language sufficiently broad to include them both. We see nothing either in contemporaneous history, in the legal situation at the time of the passage of the statute, in its legislative history, or in any general difference in the nature or kind of these trading or manufacturing companies from railroad companies, which would lead us to the conclusion that it cannot be supposed the legislature in prohibiting the making of contracts in restraint of trade intended to include railroads within the purview of that act.

Neither is the statute, in our judgment, so uncertain in its meaning, or its language so vague, that it ought not to be held applicable to railroads. It prohibits contracts, combinations, etc., in restraint of trade or commerce. Transporting commodities is commerce, and if from one State to or through another it is interstate commerce. To be reached by the Federal statute it must be commerce among the several States or with foreign nations. When the act prohibits contracts in restraint of trade or commerce, the plain meaning of the language used includes contracts which relate to either or both subjects. Both trade and commerce are included so long as each relates to that which is interstate or foreign. Transportation of commodities among the several States or with foreign nations falls within the description of the words of the statute with regard to that subject, and there is also included in that language that kind of trade in commodities among the States or with foreign nations which is not confined to their mere transportation. It includes their purchase and sale. Precisely at what point in the course of the trade in or manufacture of commodities the statute may have effect upon them, or upon contracts relating to them, may be somewhat difficult to determine, but interstate transportation presents no difficulties. In *United States* v. *E. C. Knight Co.* 156 U. S. 1, heretofore cited, it was in substance held, reiterating the language of Mr. Justice Lamar in *Kidd* v. *Pearson*, 128 U. S. 1, that the intent to manufacture or export a manufactured article to foreign nations or to send it to another State did not determine the time when the article or product passed from the control of the State and

belonged to commerce. The difficulty in determining that question, however, is no reason for denying effect to language which, by its terms, plainly includes the transportation of commodities among the several States or with foreign nations, and which may also be the subject of contracts or combinations in restraint of such commerce. The difficulty of the subject, so far as the trade in or the manufacture of commodities is concerned, arises from the limited control which Congress has over the matter of trade or manufacture. It was said by Mr. Justice Lamar in *Kidd* v. *Pearson* (*supra*): "If it be held that the term" (commerce) "includes the regulation of all such manufactures as are intended to be the subject of commercial transactions in the future, it is impossible to deny that it would also include the productive industries that contemplate the same thing. The result would be that Congress would be invested, to the exclusion of the States, with the power to regulate, not only manufactures, but also agriculture, horticulture, stock raising, domestic fisheries and mining — in short, every branch of human industry."

In the *Knight Company case* (*supra*) it was said that this statute applied to monopolies in restraint of interstate or international trade or commerce, and not to monopolies in the manufacture even of a necessary of life. It is readily seen from these cases that if the act do not apply to the transportation of commodities by railroads from one State to another or to foreign nations, its application is so greatly limited that the whole act might as well be held inoperative.

Still another ground for holding the act inapplicable is urged, and that is that the language covers only contracts or combinations like trusts or those which, while not exactly trusts, are otherwise of the same form or nature. This is clearly not so.

While the statute prohibits all combinations in the form of trusts or otherwise, the limitation is not confined to that form alone. All combinations which are in restraint of trade or commerce are prohibited, whether in the form of trusts or in any other form whatever.

We think, after a careful examination, that the statute

covers, and was intended to cover, common carriers by railroad.

Second. The next question to be discussed is as to what is the true construction of the statute, assuming that it applies to common carriers by railroad. What is the meaning of the language as used in the statute, that "every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several States or with foreign nations, is hereby declared to be illegal"? Is it confined to a contract or combination which is only in unreasonable restraint of trade or commerce, or does it include what the language of the act plainly and in terms covers, all contracts of that nature?

We are asked to regard the title of this act as indicative of its purpose to include only those contracts which were unlawful at common law, but which require the sanction of a Federal statute in order to be dealt with in a Federal court. It is said that when terms which are known to the common law are used in a Federal statute those terms are to be given the same meaning that they received at common law, and that when the language of the title is "to protect trade and commerce against unlawful restraints and monopolies," it means those restraints and monopolies which the common law regarded as unlawful, and which were to be prohibited by the Federal statute. We are of opinion that the language used in the title refers to and includes and was intended to include those restraints and monopolies which are made unlawful in the body of the statute. It is to the statute itself that resort must be had to learn the meaning thereof, though a resort to the title here creates no doubt about the meaning of and does not alter the plain language contained in its text.

It is now with much amplification of argument urged that the statute, in declaring illegal every combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce, does not mean what the language used therein plainly imports, but that it only means to declare illegal any such contract which is in *unreasonable* restraint of trade, while leaving all others unaffected by the provisions of the

act; that the common law meaning of the term " contract in restraint of trade" includes only such contracts as are in *unreasonable* restraint of trade, and when that term is used in the Federal statute it is not intended to include all contracts in restraint of trade, but only those which are in unreasonable restraint thereof.

The term is not of such limited signification. Contracts in restraint of trade have been known and spoken of for hundreds of years both in England and in this country, and the term includes all kinds of those contracts which in fact restrain or may restrain trade. Some of such contracts have been held void and unenforceable in the courts by reason of their restraint being unreasonable, while others have been held valid because they were not of that nature. A contract may be in restraint of trade and still be valid at common law. Although valid, it is nevertheless a contract in restraint of trade, and would be so described either at common law or elsewhere. By the simple use of the term " contract in restraint of trade," all contracts of that nature, whether valid or otherwise, would be included, and not alone that kind of contract which was invalid and unenforceable as being in unreasonable restraint of trade. When, therefore, the body of an act pronounces as illegal every contract or combination in restraint of trade or commerce among the several States, etc., the plain and ordinary meaning of such language is not limited to that kind of contract alone which is in unreasonable restraint of trade, but all contracts are included in such language, and no exception or limitation can be added without placing in the act that which has been omitted by Congress.

Proceeding, however, upon the theory that the statute did not mean what its plain language imported, and that it intended in its prohibition to denounce as illegal only those contracts which were in unreasonable restraint of trade, the courts below have made an exhaustive investigation as to the general rules which guide courts in declaring contracts to be void as being in restraint of trade, and therefore against the public policy of the country. In the course of their discussion

of that subject they have shown that there has been a gradual though great alteration in the extent of the liberty granted to the vendor of property in agreeing, as part consideration for his sale, not to enter into the same kind of business for a certain time or within a certain territory. So long as the sale was the *bona fide* consideration for the promise and was not made a mere excuse for an evasion of the rule itself, the later authorities, both in England and in this country, exhibit a strong tendency towards enabling the parties to make such a contract in relation to the sale of property, including an agreement not to enter into the same kind of business, as they may think proper, and this with the view to granting to a vendor the freest opportunity to obtain the largest consideration for the sale of that which is his own. A contract which is the mere accompaniment of the sale of property, and thus entered into for the purpose of enhancing the price at which the vendor sells it, which in effect is collateral to such sale, and where the main purpose of the whole contract is accomplished by such sale, might not be included, within the letter or spirit of the statute in question. But we cannot see how the statute can be limited, as it has been by the courts below, without reading into its text an exception which alters the natural meaning of the language used, and that, too, upon a most material point, and where no sufficient reason is shown for believing that such alteration would make the statute more in accord with the intent of the law-making body that enacted it.

The great stress of the argument for the defendants on this branch of the case has been to show, if possible, some reason in the attendant circumstances, or some fact existing in the nature of railroad property and business upon which to found the claim, that although by the language of the statute agreements or combinations in restraint of trade or commerce are included, the statute really means to declare illegal only those contracts, etc., which are in unreasonable restraint of trade. In order to do this the defendants call attention to many facts which they have already referred to in their argument, upon the point that railroads were not included at all in the statute. They again draw attention to the fact of the peculiar nature of

railroad property.   When a railroad is once built, it is said, it must be kept in operation; it must transport property, when necessary in order to keep its business, at the smallest price and for the narrowest profit, or even for no profit, provided running expenses can be paid, rather than not to do the work; that railroad property cannot be altered for use for any other purpose, at least without such loss as may fairly be called destructive; that competition while, perhaps, right and proper in other business, simply leads in railroad business to financial ruin and insolvency, and to the operation of the road by receivers in the interest of its creditors instead of in that of its owners and the public; that a contest between a receiver of an insolvent corporation and one which is still solvent tends to ruin the latter company, while being of no benefit to the former; that a receiver is only bound to pay operating expenses, so he can compete with the solvent company and oblige it to come down to prices incompatible with any profit for the work done, and until ruin overtakes it to the destruction of innocent stockholders and the impairment of the public interests.

To the question why competition should necessarily be conducted to such an extent as to result in this relentless and continued war, to eventuate only in the financial ruin of one or all of the companies indulging in it, the answer is made that if competing railroad companies be left subject to the sway of free and unrestricted competition the results above foreshadowed necessarily happen from the nature of the case; that competition being the rule, each company will seek business to the extent of its power, and will underbid its rival in order to get the business, and such underbidding will act and react upon each company until the prices are so reduced as to make it impossible to prosper or live under them; that it is too much to ask of human nature for one company to insist upon charges sufficiently high to afford a reasonable compensation, and while doing so to see its patrons leave for rival roads who are obtaining its business by offering less rates for doing it than can be afforded and a fair profit obtained therefrom. Sooner than experience ruin from mere inanition, efforts will

be made in the direction of meeting the underbidding of its rival until both shall end in ruin.   The only refuge, it is said, from this wretched end lies in the power of competing roads agreeing among themselves to keep up prices for transportation to such sums as shall be reasonable in themselves, so that companies may be allowed to save themselves from themselves, and to agree not to attack each other, but to keep up reasonable and living rates for the services performed.   It is said that as railroads have a right to charge reasonable rates it must follow that a contract among themselves to keep up their charges to that extent is valid.   Viewed in the light of all these facts it is broadly and confidently asserted that it is impossible to believe that Congress or any other intelligent and honest legislative body could ever have intended to include all contracts or combinations in restraint of trade, and as a consequence thereof to prohibit competing railways from agreeing among themselves to keep up prices for transportation to such a rate as should be fair and reasonable.

These arguments it must be confessed bear with much force upon the policy of an act which should prevent a general agreement upon the question of rates among competing railroad companies to the extent simply of maintaining those rates which were reasonable and fair.

There is another side to this question, however, and it may not be amiss to refer to one or two facts which tend to somewhat modify and alter the light in which the subject should be regarded.   If only that kind of contract which is in unreasonable restraint of trade be within the meaning of the statute, and declared therein to be illegal, it is at once apparent that the subject of what is a reasonable rate is attended with great uncertainty.   What is a proper standard by which to judge the fact of reasonable rates?   Must the rate be so high as to enable the return for the whole business done to amount to a sum sufficient to afford the shareholder a fair and reasonable profit upon his investment?   If so, what is a fair and reasonable profit?   That depends sometimes upon the risk incurred, and the rate itself differs in different localities: which is the one to which reference is to be made as the standard?   Or is

the reasonableness of the profit to be limited to a fair return upon the capital that would have been sufficient to build and equip the road, if honestly expended? Or is still another standard to be created, and the reasonableness of the charges tried by the cost of the carriage of the article and a reasonable profit allowed on that? And in such case would contribution to a· sinking fund to make repairs upon the roadbed and renewal of cars, etc., be assumed as a proper item? Or is the reasonableness of the charge to be tested by reference to the charges for the transportation of the same kind of property made by other roads similarly situated? If the latter, a combination among such roads as to rates would, of course, furnish no means of answering the question. It is quite apparent, therefore, that it is exceedingly difficult to formulate even the terms of the rule itself which should govern in the matter of determining what would·be reasonable rates for transportation. While even after the standard should be determined there is such an infinite variety of facts entering into the question of what is a reasonable rate, no matter what standard is adopted, that any individual shipper would in most cases be apt to abandon the effort to show the unreasonable character of a charge, sooner than hazard the great expense in time and money necessary to prove the fact, and at the same time incur the ill-will of the road itself in all his future dealings with ·it. To say, therefore, that the act excludes agreements which are not in unreasonable restraint of trade, and which tend simply to keep up reasonable rates for transportation, is substantially to leave the question of reasonableness to the companies themselves.

It must also be remembered that railways are public corporations organized for public purposes, granted valuable franchises and privileges, among which the right to take the private property of the citizen *in invitum* is not the least, *Cherokee.Nation* v. *Southern Kansas Railway Co.*, 135 U. S. 641, 657 ; that many of them are the donees of large tracts of public lands and' of gifts of money by municipal corporations, and that they all primarily owe duties to the public of a higher nature .even than that of earning large dividends for

their shareholders. The business which the railroads do is of a public nature, closely affecting almost all classes in the community — the farmer, the artisan, the manufacturer and the trader. It is of such a public nature that it may well be doubted, to say the least, whether any contract which imposes any restraint upon its business would not be prejudicial to the public interest.

We recognize the argument upon the part of the defendants that restraint upon the business of railroads will not be prejudicial to the public interest so long as such restraint provides for reasonable rates for transportation and prevents the deadly competition so liable to result in the ruin of the roads and to thereby impair their usefulness to the public, and in that way to prejudice the public interest. But it must be remembered that these results are by no means admitted with unanimity ; on the contrary, they are earnestly and warmly denied on the part of the public and by those who assume to defend its interests both in and out of Congress. Competition, they urge, is a necessity for the purpose of securing in the end just and proper rates.

It was said in *Gibbs* v. *Baltimore Gas Company*, 130 U. S. 396, at page 408, by Mr. Chief Justice Fuller, as follows: " The supplying of illuminating gas is a business of a public nature to meet a public necessity. It is not a business like that of an ordinary corporation engaged in the manufacture of articles that may be furnished by individual effort. *New Orleans Gas Co.* v. *Louisiana Light Co.*, 115 U. S. 650 ; *Louisville Gas Co.* v. *Citizens' Gas Co.*, 115 U. S. 683 ; *Shepard* v. *Milwaukee Gas Co.*, 6 Wisconsin, 539 ; *Chicago Gas Light & Coke Co.* v. *People's Gas Light & Coke Co.*, 121 Illinois, 530 ; *St. Louis* v. *St. Louis Gas Light Co.*, 70 Missouri, 69. Hence, while it is justly urged that those rules which say that a given contract is against public policy, should not be arbitrarily extended so as to interfere with the freedom of contract, *Printing &c. Registering Co.* v. *Sampson*, L. R. 19 Eq. 462, yet in the instance of business of such a character that it presumably cannot be restrained to any extent whatever without prejudice to the public interest, courts decline to enforce or

sustain contracts imposing such restraint, however partial, because in contravention of public policy. This subject is much considered, and the authorities cited in *West Virginia Transportation Co.* v. *Ohio River Pipe Line Co.*, 22 West Va. 600; *Chicago &c. Gas Co.* v. *People's Gas Co.*, 121 Illinois, 530; *Western Union Telegraph Co.* v. *American Union Telegraph Co.*, 65 Georgia, 160."

It is true that in the *Gibbs case* there was a special statute which prohibited the company from entering into any consolidation, combination or contract with any other gas company whatever, and it was provided that any attempt to do so or to make such combination or contract should be utterly null and void. The above extract from the opinion of the court is made for the purpose of showing the difference which exists between a private and a public corporation — that kind of a public corporation which, while doing business for remuneration, is yet so connected in interest with the public as to give a public character to its business — and it is seen that while, in the absence of a statute prohibiting them, contracts of private individuals or corporations touching upon restraints in trade must be unreasonable in their nature to be held void, different considerations obtain in the case of public corporations like those of railroads where it well may be that any restraint upon a business of that character as affecting its rates of transportation must thereby be prejudicial to the public interests.

The plaintiffs are, however, under no obligation in order to maintain this action to show that by the common law all agreements among competing railroad companies to keep up rates to such as are reasonable were void as in restraint of trade or commerce. There are many cases which look in that direction if they do not precisely decide that point. Some of them are referred to in the opinion in the *Baltimore Gas Company case*, above cited. The case of the *Mogul Steamship Company* v. *McGregor*, 21 Q. B. D. 544; 23 Q. B. D. 598; 1892, App. Cas. 25, has been cited by the courts below as holding in principle that contracts of this nature are valid at common law. The agreement held valid there was

an agreement for lowering rates of transportation among the parties thereto, and it was entered into for the purpose of driving out of trade rival steamships in order that thereafter the rates might be advanced. The English courts held that the agreement was not a conspiracy, and that it was valid, although the result aimed at was to drive a rival out of the field, because so long as the injury to such rival was not the sole reason for the agreement, but self-interest the predominating motive, there was nothing wrong in law with an agreement of that kind. But assuming that agreements of this nature are not void at common law and that the various cases cited by the learned courts below show it, the answer to the statement of their validity now is to be found in the terms of the statute under consideration. The provisions of the Interstate Commerce Act relating to reasonable rates, discriminations, etc., do not authorize such an agreement as this, nor do they authorize any other agreements which would be inconsistent with the provisions of this act.

The general reasons for holding agreements of this nature to be invalid even at common law, on the part of railroad companies are quite strong, if not entirely conclusive.

Considering the public character of such corporations, the privileges and franchises which they have received from the public in order that they might transact business, and bearing in mind how closely and immediately the question of rates for transportation affects the whole public, it may be urged that Congress had in mind all the difficulties which we have before suggested of proving the unreasonableness of the rate, and might, in consideration of all the circumstances, have deliberately decided to prohibit all agreements and combinations in restraint of trade or commerce, regardless of the question whether such agreements were reasonable or the reverse.

It is true that, as to a majority of those living along its line, each railroad is a monopoly. Upon the subject now under consideration it is well said by Judge Oliver P. Shiras, United States District Judge, Northern District of Iowa, in his very able dissenting opinion in this case in the United States Circuit Court of Appeals, as follows:

" As to the majority of the community living along its line,
each railway company has a monopoly of the business de-
manding transportation as one of its elements.   By reason of
this fact the action of this corporation in establishing the rates
to be charged largely influences the net profit coming to the
farmer, the manufacturer and the merchant, from the sale of
the products of the farm, the workshop and manufactory, and
of the merchandise purchased and resold, and also largely
influences the price to be paid by every one who consumes any
of the property transported over the line of railway.   There
is no other line of business carried on in our midst which is
so intimately connected with the public as that conducted by
the railways of the country.  .  .  .   A railway corporation
engaged in the transportation of the persons and property of
the community is always carrying on a public business which
at all times directly affects the public welfare.   All contracts
or combinations entered into between railway corporations
intended to regulate the rates to be charged the public for
the service rendered, must of necessity affect the public
interests.   By reason of this marked distinction existing be-
tween enterprises inherently public in their character and
those of a private nature, and further by reason of the differ-
ence between private persons and corporations engaged in
private pursuits, who owe no direct or primary duty to the
public and public corporations created for the express purpose
of carrying on public enterprises, and which, in consideration
of the public powers exercised in their behalf, are under obliga-
tion to carry on the work intrusted to their management pri-
marily in the interest and for the benefit of the community,
it seems clear to me that the same test is not applicable to
both classes of business and corporations in determining the
validity of contracts and combinations entered into by those
engaged therein.  .  .  .   In the opinion of the court are
found citations from the reports of the Interstate Commerce
Commission in which are depicted the evils that are occasioned
to the railway companies and the public by warfares over rate
charges, and the advantages that are gained in many directions
by proper conference and concert of action among the com-

peting lines.   It may be entirely true that as we proceed in the development of the policy of public control over railway traffic, methods will be devised and put in operation by legislative enactment whereby railway companies and the public may be protected against the evils arising from unrestricted competition and from rate wars which unsettle the business of the community, but I fail to perceive the force of the argument that because railway companies *through their own action cause evils to themselves* and the public by sudden changes or reductions in tariff rates they must be permitted to deprive the community of the benefit of competition in securing reasonable rates for the transportation of the products of the country.   Competition, free and unrestricted, is the general rule which governs all the ordinary business pursuits and transactions of life.   Evils, as well as benefits, result therefrom.   In the fierce heat of competition the stronger competitor may crush out the weaker; fluctuations in prices may be caused that result in wreck and disaster; yet, balancing the benefits as against the evils, the law of competition remains as a controlling element in the business world.   That free and unrestricted competition in the matter of railroad charges may be productive of evils does not militate against the fact that such is the law now governing the subject.   No law can be enacted nor system be devised for the control of human affairs that in its enforcement does not produce some evil results, no matter how beneficial its general purpose may be.   There are benefits and there are evils which result from the operation of the law of free competition between railway companies.   The time may come when the companies will be relieved from the operation of this law, but they cannot, by combination and agreements among themselves, bring about this change.   The fact that the provisions of the Interstate Commerce Act may have changed in many respects the conduct of the companies in the carrying on of the public business they are engaged in does not show that it was the intent of Congress, in the enactment of that statute, to clothe railway companies with the right to combine together for the purpose of avoiding the effects of competition on the subject of rates."

The whole opinion is a remarkably strong presentation of the views of the learned judge who wrote it.

Still, again, it is answered that the effects of free competition among railroad companies, as described by the counsel for the companies themselves in the course of their argument, are greatly exaggerated. According to that argument, the moment an agreement of this nature is prohibited the railroads commence to cut their rates, and they cease only with their utter financial ruin, leaving, perhaps, one to raise rates indefinitely when its rivals have been driven away. It is said that this is a most overdrawn statement, and that while absolutely free competition may have in some instances and for a time resulted in injury to some of the railroads, it is not at all clear that the general result has been other than beneficial to the whole public, and not in the long run detrimental to the prosperity of the roads. It is matter of common knowledge that agreements as to rates have been continually made of late years, and that complaints of each company in regard to the violation of such agreements by its rivals have been frequent and persistent. Rate wars go on notwithstanding any agreement to the contrary, and the struggle for business among competing roads keeps on, and in the nature of things will keep on, any alleged agreement to the contrary notwithstanding, and it is only by the exercise of good sense and by the presence of a common interest that railroads, without entering into any affirmative agreement in regard thereto, will keep within the limit of exacting a fair and reasonable return for services rendered. These agreements have never been found really effectual for any extended period.

The Interstate Commerce Commission, from whose reports quotations have been quite freely made by counsel for the purpose of proving the views of its learned members in regard to this subject, has never distinctly stated that agreements among competing railroads to maintain prices are to be commended, or that the general effect is to be regarded as beneficial. They have stated in their fourth annual report that competition may degenerate into rate wars, and that such wars are as unsettling to the business of the country

as they are mischievous to the carriers, and that the spirit of existing law is against them. They then add : " Agreements between railroad companies which from time to time they have entered into with a view to prevent such occurrences have never been found effectual, and for the very sufficient reason, that the mental reservations in forming them have been quite as numerous and more influential than the written stipulations." It would seem true, therefore, that there is no guaranty of financial health to be found in entering into agreements for the maintenance of rates, nor is financial ruin or insolvency the necessary result of their absence.

The claim that the company has the right to charge reasonable rates, and that, therefore, it has the right to enter into a combination with competing roads to maintain such rates, cannot be admitted. The conclusion does not follow from an admission of the premise. What one company may do in the way of charging reasonable rates is radically different from entering into an agreement with other and competing roads to keep up the rates to that point. If there be any competition the extent of the charge for the service will be seriously affected by that fact. Competition will itself bring charges down to what may be reasonable, while in the case of an agreement to keep prices up, competition is allowed no play ; it is shut out, and the rate is practically fixed by the companies themselves by virtue of the agreement, so long as they abide by it.

As a result of this review of the situation, we find two very widely divergent views of the effects which might be expected to result from declaring illegal all contracts in restraint of trade, etc. ; one side predicting financial disaster and ruin to competing railroads, including thereby the ruin of shareholders, the destruction of immensely valuable properties, and the consequent prejudice to the public interest ; while on the other side predictions equally earnest are made that no such mournful results will follow, and it is urged that there is a necessity, in order that the public interest may be fairly and justly protected, to allow free and open competition among railroads upon the subject of the rates for the transportation of persons and property.

The arguments which have been addressed to us against the inclusion of all contracts in restraint of· trade, as provided for by the language of the act, have been based upon the alleged presumption that Congress, notwithstanding the language of the act, could not have intended to embrace all contracts, but only such contracts as were in unreasonable restraint of trade. Under these circumstances we are, therefore, asked to hold that the act of Congress excepts contracts which are not in unreasonable restraint of trade, and which only keep rates up to a reasonable price, notwithstanding the language of the act makes no such exception. In other words, we are asked to read into the act by way of judicial legislation an exception that is not placed there by the law-making branch of the Government, and this is to be done upon the theory that the impolicy of such legislation is so clear that it cannot be supposed Congress intended the natural import of the language it used. This we cannot and ought not to do. That impolicy is not so clear, nor are the reasons for the exception so potent as to permit us to interpolate an exception into the language of the act, and to thus materially alter its meaning and effect. It may be that the policy evidenced by the passage of the act itself will, if carried out, result in disaster to the roads and in a failure to secure the advantages sought from such legislation. Whether that will be the result or not we do not know and cannot predict. These considerations are, however, not for us. If the act ought to read as contended for by defendants, Congress is the body to amend it and not this court, by a process of judicial legislation wholly unjustifiable. Large numbers do not agree that the view taken by defendants is sound or true in substance, and Congress may and very probably did share in that belief in passing the act. The public policy of the Government is to be found in its statutes, and when they have not directly spoken, then in the decisions of the courts and the constant practice of the government officials; but when the lawmaking power speaks upon a particular subject, over which it has constitutional power to legislate, public policy in such a case is what the statute enacts. If the law prohibit any con-

tract or combination in restraint of trade or commerce, a contract or combination made in violation of such law is void, whatever may have been theretofore decided by the courts to have been the public policy of the country on that subject.

The conclusion which we have drawn from the examination above made into the question before us is that the Anti-Trust Act applies to railroads, and that it renders illegal all agreements which are in restraint of trade or commerce as we have above defined that expression, and the question then arises whether the agreement before us is of that nature.

Although the case is heard on bill and answer, thus making it necessary to assume the truth of the allegations in the answer which are well pleaded, yet the legal effect of the agreement itself cannot be altered by the answer, nor can its violation of law be made valid by allegations of good intention or of desire to simply maintain reasonable rates; nor can the plaintiffs' allegations as to the intent with which the agreement was entered into be regarded, as such intent is denied on the part of the defendants; and if the intent alleged in the bill were a necessary fact to be proved in order to maintain the suit, the bill would have to be dismissed. In the view we have taken of the question, the intent alleged by the Government is not necessary to be proved. The question is one of law in regard to the meaning and effect of the agreement itself, namely: Does the agreement restrain trade or commerce in any way so as to be a violation of the act? We have no doubt that it does. The agreement on its face recites that it is entered into " for the purpose of mutual protection by establishing and maintaining reasonable rates, rules and regulations on all freight traffic, both through and local." To that end the association is formed and a body created which is to adopt rates, which, when agreed to, are to be the governing rates for all the companies, and a violation of which subjects the defaulting company to the payment of a penalty, and although the parties have a right to withdraw from the agreement on giving thirty days' notice of a desire so to do, yet while in force and assuming it to be lived up to, there can be no doubt

that its direct, immediate and necessary effect is to put a restraint upon trade or commerce as described in the act.

For these reasons the suit of the Government can be maintained without proof of the allegation that the agreement was entered into for the purpose of restraining trade or commerce or for maintaining rates above what was reasonable. The necessary effect of the agreement is to restrain trade or commerce, no matter what the intent was on the part of those who signed it.

One or two subsidiary questions remain to be decided.

It is said that to grant the injunction prayed for in this case is to give the statute a retroactive effect; that the contract at the time it was entered into was not prohibited or declared illegal by the statute, as it had not then been passed; and to now enjoin the doing of an act which was legal at the time it was done would be improper. We give to the law no retroactive effect. The agreement in question is a continuing one. The parties to it adopt certain machinery, and agree to certain methods for the purpose of establishing and maintaining in the future reasonable rates for transportation. Assuming such action to have been legal at the time the agreement was first entered into, the continuation of the agreement, after it has been declared to be illegal, becomes a violation of the act. The statute prohibits the continuing or entering into such an agreement for the future, and if the agreement be continued it then becomes a violation of the act. There is nothing of an *ex post facto* character about the act. The civil remedy by injunction and the liability to punishment under the criminal provisions of the act are entirely distinct, and there can be no question of any act being regarded as a violation of the statute which occurred before it was passed. After its passage, if the law be violated, the parties violating it may render themselves liable to be punished criminally; but not otherwise.

It is also argued that the United States have no standing in court to maintain this bill; that they have no pecuniary interest in the result of the litigation or in the question to be decided by the court. We think that the fourth section of

the act invests the Government with full power and authority to bring such an action as this, and if the facts be proved, an injunction should issue. Congress having the control of interstate commerce, has also the duty of protecting it, and it is entirely competent for that body to give the remedy by injunction as more efficient than any other civil remedy. The subject is fully and ably discussed in the case of *In re Debs*, 158 U. S. 564. See also *Cincinnati, New Orleans &c. Railway* v. *Interstate Commerce Commission*, 162 U. S. 184; *Texas & Pacific Railway* v. *Interstate Commerce Commission*, 162 U. S. 197.

For the reasons given, the decrees of the United States Circuit Court of Appeals and of the Circuit Court for the District of Kansas must be

*Reversed, and the case remanded to the Circuit Court for further proceedings in conformity with this opinion.*

MR. JUSTICE WHITE, with whom concurred MR. JUSTICE FIELD, MR. JUSTICE GRAY and MR. JUSTICE SHIRAS, dissenting.

It is unnecessary to refer to the authorities showing that although a contract may in some measure restrain trade, it is not for that reason void or even voidable unless the restraint which it produces be unreasonable. The opinion of the court concedes this to be the settled doctrine.

The contract between the railway companies which the court holds to be void because it is found to violate the act of Congress of the 2d of July, 1890, 26 Stat. 209, substantially embodies only an agreement between the corporations by which a uniform classification of freight is obtained, by which the secret under-cutting of rates is sought to be avoided, and the rates as stated in the published rate sheets, and which, as a general rule, are required by law to be filed with the Interstate Commerce Commission, are secured against arbitrary and sudden changes. I content myself with giving this mere outline of the results of the contract, and do not stop to demonstrate that its provisions are reasonable, since the opinion of

the court rests upon that hypothesis. I commence, then, with these two conceded propositions, one of law and the other of fact, first, that only such contracts as unreasonably restrain trade are violative of the general law, and, second, that the particular contract here under consideration is reasonable, and therefore not unlawful if the general principles of law are to be applied to it.

The theory upon which the contract is held to be illegal is that even though it be reasonable, and hence valid, under the general principles of law, it is yet void, because it conflicts with the act of Congress already referred to. Now, at the outset, it is necessary to understand the full import of this conclusion. As it is conceded that the contract does not unreasonably restrain trade, and that if it does not so unreasonably restrain, it is valid under the general law, the decision, substantially, is that the act of Congress is a departure from the general principles of law, and by its terms destroys the right of individuals or corporations to enter into very many reasonable contracts. But this proposition, I submit, is tantamount to an assertion that the act of Congress is itself unreasonable. The difficulty of meeting, by reasoning, a premise of this nature is frankly conceded, for, of course, where the fundamental proposition upon which the whole contention rests is that the act of Congress is unreasonable, it would seem conducive to no useful purpose to invoke reason as applicable to and as controlling the construction of a statute which is admitted to be beyond the pale of reason. The question, then, is, is the act of Congress relied on to be so interpreted as to give it a reasonable meaning, or is it to be construed as being unreasonable and as violative of the elementary principles of justice?

The argument upon which it is held that the act forbids those reasonable contracts which are universally admitted to be legal is thus stated in the opinion of the court, and I quote the exact language in which it is there expressed, lest in seeking to epitomize I may not accurately reproduce the thought which it conveys:

"Contracts in restraint of trade have been known and

spoken of for hundreds of years both in England and in this country, and the term includes all kinds of those contracts which in fact restrain trade. Some of such contracts have been held void and unenforcible in the courts by reason of their restraint being unreasonable, while others have been held valid because they were not of that nature. A contract may be in restraint of trade and still be valid at common law. Although valid, it is nevertheless a contract in restraint of trade, and would be so described either at common law or elsewhere. By the simple use of the term 'contract in restraint of trade,' all contracts of that nature, whether valid or otherwise, would be included, and not alone that kind of contract which was invalid and unenforcible as being in unreasonable restraint of trade. When, therefore, the body of an act pronounces as illegal every contract or combination in restraint of trade or commerce among the several States, etc., the plain and ordinary meaning of such language is not limited to that kind of contract alone which is in unreasonable restraint of trade, but all contracts are included in such language, and no exception or limitation can.be added without placing in the act that which has been omitted by Congress."

To state the proposition in the form in which it was earnestly pressed in the argument at bar, it is as follows: Congress has said every contract in restraint of trade is illegal. When the law says every, there is no power in the courts, if they correctly interpret and apply the statute, to substitute the word "some" for the word "every." If Congress had meant to forbid only restraints of trade which were unreasonable it would have said so; instead of doing this it has said *every,* and this word of universality embraces both contracts which are reasonable and unreasonable.

Is the proposition which is thus announced by the court, and which was thus stated at bar, well founded? is the first question which arises for solution. I quote the title and the first section of the act which, it is asserted, if correctly interpreted, destroys the right to make just and reasonable contracts:

"An act to protect trade and commerce against unlawful restraints and monopolies.

"Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal. Every person who shall make any such contract or engage in any such combination or conspiracy, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both said punishments in the discretion of the court."

Is it correct to say that at common law the words "restraint of trade" had a generic signification which embraced all contracts which restrained the freedom of trade, whether reasonable or unreasonable, and, therefore, that all such contracts are within the meaning of the words "every contract in restraint of trade"? I think a brief consideration of the history and development of the law on the subject will not only establish the inaccuracy of this proposition, but also demonstrate that the words "restraint of trade" embrace only contracts which unreasonably restrain trade, and, therefore, that reasonable contracts, although they, in some measure, "restrain trade," are not within the meaning of the words. It is true that in the adjudged cases language may be found referring to contracts in restraint of trade which are valid because reasonable. But this mere form of expression, used not as a definition, does not maintain the contention that such contracts are embraced within the general terms every contract in restraint of trade. The rudiments of the doctrine of contracts in restraint of trade are found in the common law at a very early date. The first case on the subject is reported in 6 Year Book 5, 2 Hen. V, and is known as *Dier's case.* That was an action of damages upon a bond conditioned that the defendant should not practise his trade as a dyer at a particular place during a limited period, and it was held that the contract was illegal. The principle upon which this case was decided was not described as one forbidding contracts in restraint of trade, but was stated to be one by which contracts restricting the liberty of

the subject were forbidden. The doctrine declared in that case was applied in subsequent cases in England prior to the case of *Mitchel* v. *Reynolds*, decided in 1711, and reported in 1 P. Wms. 181. There the distinction between general restraints and partial restraints was first definitely formulated, and it was held that a contract creating a partial restraint was valid and one creating a general restraint was not. The theory of partial and general restraints established by that case was followed in many decided cases in England, not, however, without the correctness of the difference between the two being in some instances denied and in others questioned, until the matter was set finally at rest by the House of Lords in *Nordenfelt* v. *The Maxim Nordenfelt Guns and Ammunition Co.*, reported in (1894) App. Cas. 535. In that case it was held that the distinction between partial and general restraint was an incorrect criterion, but that whether a contract was invalid because in restraint of trade must depend upon whether, on considering all the circumstances, the contract was found to be reasonable or unreasonable. If reasonable, it was not a contract in restraint of trade, and if unreasonable it was.

The decisions of the American courts substantially conform to both the development and ultimate results of the English cases. Whilst the rule of partial and general restraint has been either expressly or impliedly admitted, the exact scope of the distinction between the two has been the subject of discussion and varying adjudication. And although it is accurate to say that in the cases expressions may be found speaking of contracts as being in form, in restraint of trade and yet valid, it results from an analysis of all the American cases, as it does from the English, that these expressions in no way imply that contracts which were valid because they only partially restrained trade were yet considered as embraced within the definition of contracts in restraint of trade. On the contrary, the reason of the cases, where contracts partially restraining trade were excepted and hence held to be valid, was because they were not contracts in restraint of trade in the legal meaning of those words. Referring to the modern and Ameri-

can rule on the subject, Beach in his recent treatise on the Modern Law of Contracts, at section 1569, says:

"The tendency of modern thought and decisions has been no longer to uphold in its strictness the doctrine which formerly prevailed respecting agreements in restraint of trade. The severity with which such agreements were treated in the beginning has relaxed more and more *by exceptions and qualifications*, and a gradual change has taken place, brought about by the growth of industrial activities, and the enlargement of commercial facilities which tend to render such agreements less dangerous, because monopolies are less easy of accomplishment."

The fact that the exclusion of reasonable contracts from the doctrine of restraint of trade was predicated on the conclusion that such contracts were no longer considered as coming within the meaning of the words "restraint of trade," is nowhere more clearly and cogently stated than in the opinion of the Court of Appeals of the State of New York, in the case of *Matthews* v. *Associated Press of New York*, 136 N. Y. 333. In considering the contention that a by-law of the defendant association which prohibited its members from receiving or publishing "the regular news dispatches of any other news association covering a like territory and organized for a like purpose" was void, because it tended to restrain trade and competition and to create a monopoly, the learned judge said (p. 340):

"We do not think the by-law improperly tends to restrain trade, assuming that the business of collecting and distributing news would come within the definition of a trade. The latest decisions of courts in this country and in England show a strong tendency to very greatly circumscribe and narrow the doctrine of avoiding contracts in restraint of trade. *The courts do not go to the length of saying that contracts which they now would say are in restraint of trade are, nevertheless, valid contracts, and to be enforced; they do, however, now hold many contracts not open to the objection that they are in restraint of trade which a few years back would have been avoided on that sole ground, both here and in England.* The

cases in this court which are the latest manifestations of the turn in the tide are cited in the opinion in this case at general term, and are *Diamond Match Co.* v. *Roeber*, 106 N. Y. 73; *Hodge* v. *Neill*, 107 N. Y. 244; *Leslie* v. *Lorillard*, 110 N. Y. 519.

" So that when we agree that a by-law which is in restraint of trade is void, we are still brought back *to the question what is a restraint of trade in the modern definition of that term ?* The authority to make by-laws must also be limited by the scope and purpose of the association.   I think this by-law is thus limited, and that *it is not in restraint of trade as the courts now interpret that phrase.*"

This lucid statement aptly sums up the process of reasoning by which partial and reasonable contracts came no longer to be considered as included in the words contracts in restraint of trade, and points to the fallacy embodied in the proposition that contracts which were held not to be in restraint of trade were yet covered by the words in restraint of trade; that is, that although they were not such contracts, yet they continued so to be.   After analyzing the provisions of the by-law the opinion proceeds as follows (p. 341):

" Thus a by-law of the nature complained of would have a tendency to strengthen the association and to render it more capable of filling the duty it was incorporated to perform.   A business partnership could provide that none of its members should attend to any business other than that of the partnership, and that each partner who came in must agree not to do any other business and must give up all such business as he had theretofore done.   *Such an agreement would not be in restraint of trade*, although its direct effect might be to restrain to some extent the trade which had been done."

This adds cogency to the demonstration, and shows in the most conclusive manner that the words contracts in restraint of trade do not continue to define those contracts which are no longer covered by the legal meaning of the words.

This court has not only recognized and applied the distinction between partial and general restraints, but has also decided that the true test whether a contract be in restraint of trade is

not whether in a measure it produces such effect, but whether under all the circumstances it is reasonable. *Oregon Steam Navigation Co.* v. *Winsor*, 20 Wall. 64, 68; *Gibbs* v. *Baltimore Gas Co.*, 130 U. S. 396, 409. As it is unnecessary here to enter into a detailed examination of the cases, I append in the margin a reference to decisions of some of the state courts and to several writers on the subject of contracts in restraint of trade, by whom the doctrine is reviewed and the authorities very fully referred to.[1]

It follows from the foregoing statement that at common law contracts which only partially restrain trade, to use the precise language of Maule, Justice, in *Rannie* v. *Irvine*, 7 Man. & G. 969, 978, were "*an exception engrafted upon that rule,*" that is, the rule as to contracts in restraint of trade, "*and that the exception is in furtherance of the rule itself.*" I submit, also, manifestly that the further development of the doctrine by which it was decided that if a contract was reasonable it would not be held to be included within contracts in restraint of trade, although such contract might, in some measure, produce such an effect, was also an exception to the general rule as to the invalidity of contracts in restraint of trade. The theory, then, that the words restraint of trade define and embrace all such contracts without reference to whether they are reasonable, amounts substantially to saying that, by the common law and the adjudged American cases, certain classes of contracts were carved out of and excepted from the general rule, and yet were held to remain embraced within the general rule from which they were removed. But the obvious conflict which is shown by this contradictory result to which the contention leads rests not upon the mere form of statement but upon the

---

[1] *Diamond Match Co.* v. *Roeber,* 106 N. Y. 473 ; *Leslie* v. *Lorillard,* 110 N. Y. 519, 533; *Beal* v. *Chase,* 31 Michigan, 490, 518; *National Benefit Co.* v. *Union Hospital Co.,* 45 Minnesota, 272; *Ellerman* v. *Chicago Junction Railways &c. Co.,* 49 N. J. Eq. 215, 217; *Richards* v. *Am. Desk &c. Co.,* 87 Wisconsin, 503, 514; Note to 2 Parsons on Contracts, p. 748; Note to *Angier* v. *Webber,* 92 Am. Dec. 751 (1867) ; Note to *Mitchel* v. *Reynolds,* 1 Smith's Leading Cases, 705, and Supplemental Note, 9th Am. ed. 716 (1888) ; Review of Cases by A. M. Eaton in 4 Harv. Law Review, p. 129 (1890) ; Patterson on Restraint of Trade (1891).

reason of things. This will, I submit, be shown by a very brief analysis of the reasons by which partial restraints were held not to be embraced in contracts in restraint of trade, and by which ultimately all reasonable contracts were likewise decided not to be so embraced. That is to say, that the reasoning by which the exceptions were created conclusively shows the error of contending that the words contracts in restraint of trade continued to embrace those reasonable contracts which those words no longer described.

It is perhaps true that the principle by which contracts in restraint of the freedom of the subject or of trade were held to be illegal was first understood to embrace all contracts which in any degree accomplished these results. But as trade developed it came to be understood that if contracts which only partially restrained the freedom of the subject or of trade were embraced in the rule forbidding contracts in restraint of trade, both the freedom of contract and trade itself would be destroyed. Hence, from the reason of things, arose the distinction that where contracts operated only a partial restraint of the freedom of contract or of trade they were not in contemplation of law contracts in restraint of trade. And it was this conception also which, in its final aspect, led to the knowledge that reason was to be the criterion by which it was to be determined whether a contract which, in some measure, restrained the freedom of contract and of trade, was in reality, when considered in all its aspects, a contract of that character or one which was necessary to the freedom of contract and of trade. To define, then, the words " in restraint of trade " as embracing every contract which in any degree produced that effect would be violative of reason, because it would include all those contracts which are the very essence of trade, and would be equivalent to saying that there should be no trade, and therefore nothing to restrain. The dilemma which would necessarily arise from defining the words " contracts in restraint of trade " so as to destroy trade by rendering illegal the contracts upon which trade depends, and yet presupposing that trade would continue and should not be restrained, is shown by an argument advanced, and which has been com-

pelled by the exigency of the premise upon which it is based. Thus, after insisting that the word "every" is all-embracing, it is said from the necessity of things it will not be held to apply to covenants in restraint of trade which are collateral to a sale of property, because not "supposed" to be within the letter or spirit of the statute. But how, I submit, can it be held that the words "*every* contract in restraint of trade" *embrace all* such contracts, and yet at the same time be said that certain contracts of that nature are not included? The asserted exception not only destroys the rule which is relied on, but it rests upon no foundation of reason. It must either result from the exclusion of particular classes of contracts, whether they be reasonable or not, or it must arise from the fact that the contracts referred to are merely collateral contracts. But many collateral contracts may contain provisions which make them unreasonable. The exception which is relied upon, therefore, as rendering possible the existence of trade to be restrained is either arbitrary or it is unreasonable.

But, admitting *arguendo* the correctness of the proposition by which it is sought to include every contract, however reasonable, within the inhibition of the law, the statute, considered as a whole, shows, I think, the error of the construction placed upon it. Its title is "An act to protect trade and commerce against unlawful restraints and monopolies." The word "unlawful" clearly distinguishes between contracts in restraint of trade which are lawful and those which are not. In other words, between those which are unreasonably in restraint of trade, and consequently invalid, and those which are reasonable and hence lawful. When, therefore, in the very title of the act the well-settled distinction between lawful and unlawful contracts is broadly marked, how can an interpretation be correct which holds that all contracts, whether lawful or not, are included in its provisions? Whilst it is true that the title of an act cannot be used to destroy the plain import of the language found in its body, yet when a literal interpretation will work out wrong or injury, or where the words of the statute are ambiguous, the title may be resorted to as an instrument of construction. In *United States*

v. *Palmer*, 3 Wheat. 610, where general language found in the body of a criminal statute was given a narrow and restricted meaning, Mr. Chief Justice Marshall, in the course of the opinion, said (p. 631): "The title of an act cannot control its words, but may furnish some aid in showing what was in the mind of the legislature. The title of this act is '.An act for the punishment of certain crimes against the United States.' It would seem that offences against the United States, not offences against the human race, were the crimes which the legislature intended by this law to punish."

So, also, in *United States* v. *Union Pacific Railroad*, 91 U. S. 72, where the construction of a statute was involved, it was held that the interpretation adopted was supported by the title, which disclosed the general purpose which Congress had in view in adopting the law under consideration. The same rule was announced in *Smythe* v. *Fiske*, 23 Wall. 374, 380, and *Coosaw Mining Co.* v. *South Carolina*, 144 U. S. 550, and cases there cited.

Pretermitting the consideration of the title, it cannot be denied that the words "restraint of trade" used in the act in question had long prior to the adoption of that act been construed as not embracing reasonable contracts. The well-settled rule is that where technical words are used in an act, and their meaning has previously been conclusively settled, by long usage and judicial construction, the use of the words without an indication of an intention to give them a new significance is an adoption of the generally accepted meaning affixed to the words at the time the act was passed. Particularly is this rule imperative where the statute in which the words are used creates a crime, as does the statute under consideration, and gives no specific definition of the crime created. Thus in *United States* v. *Palmer* (*supra*), Mr. Chief Justice Marshall, referring to the term "robbery" as used in the statute, said (p. 630): "Of the meaning of the term 'robbery,' as used in the statute, we think no doubt can be entertained. It must be understood in the sense in which it is recognized and defined at common law."

If these obvious rules of interpretation be applied, it seems to me they render it impossible to construe the words every restraint of trade used in the act in any other sense than as excluding reasonable contracts, as the fact that such contracts were not considered to be within the rule of contracts in restraint of trade, was thoroughly established both in England and in this country at the time the act was adopted. It is, I submit, not to be doubted that the interpretation of the words "every contract in restraint of trade," so as to embrace within its purview every contract, however reasonable, would certainly work an enormous injustice and operate to the undue restraint of the liberties of the citizen. But there is no canon of interpretation which requires that the letter be followed, when by so doing an unreasonable result is accomplished. On the contrary, the rule is the other way, and exacts that the spirit which vivifies, and not the letter which killeth, is the proper guide by which to correctly interpret a statute. In *Smythe* v. *Fiske*, 23 Wall. 374, 380, this court declared that "a thing may be within the letter of the statute and not within its meaning, and within its meaning, though not within its letter. The intention of the lawmaker is the law." In *Lau Ow Bew* v. *The United States*, 144 U. S. 47, this court, speaking through Mr. Chief Justice Fuller, said (p. 59):

"Nothing is better settled than that statutes should receive a sensible construction, such as will effectuate the legislative intention, and, if possible, so as to avoid an unjust or an absurd conclusion. *Church of the Holy Trinity* v. *United States*, 143 U. S. 457; *Henderson* v. *Mayor of New York*, 92 U. S. 259; *United States* v. *Kirby*, 7 Wall. 482; *Oates* v. *National Bank*, 100 U. S. 239."

In all the cases there cited the literal language of the statutes was disregarded, in order to restrict its operation within reason. To those cases may also be added *United States* v. *Mooney*, 116 U. S. 104, where it was contended that by the act of March 3, 1875, c. 137, the Circuit Courts were vested with jurisdiction concurrent with District Courts over certain suits. The plausibility of the argument, based upon the literal language of the statute, was conceded by the court, but the

results which would follow from sustaining the construction contended for were pointed out by the court, and it was observed (p. 107): "A construction which involves such results was clearly not contemplated by Congress."

Indeed, it seems to me there can be no doubt that reasonable contracts cannot be embraced within the provisions of the statute if it be interpreted by the light of the supreme rule commanding that the intention of the law must be carried out, and it must be so construed as to afford the remedy and frustrate the wrong contemplated by its enactment.

The plain intention of the law was to protect the liberty of contract and the freedom of trade. Will this intention not be frustrated by a construction which, if it does not destroy, at least gravely impairs, both the liberty of the individual to contract and the freedom of trade? If the rule of reason no longer determines the right of the individual to contract or secures the validity of contracts upon which trade depends and results, what becomes of the liberty of the citizen or of the freedom of trade? Secured no longer by the law of reason, all these rights become subject, when questioned, to the mere caprice of judicial authority. Thus, a law in favor of freedom of contract, it seems to me, is so interpreted as to gravely impair that freedom. Progress and not reaction was the purpose of the act of Congress. The construction now given the act disregards the whole current of judicial authority and tests the right to contract by the conceptions of that right entertained at the time of the year-books instead of by the light of reason and the necessity of modern society. To do this violates, as I see it, the plainest conception of public policy; for as said by Sir G. Jessel, Master of the Rolls, in *Printing &c. Company* v. *Sampson*, L. R. 19 Eq. 462, "if there is one thing which more than another public policy requires it is that men of full age and competent understanding shall have the utmost liberty of contracting, and their contracts when entered into freely and voluntarily shall be held sacred and shall be enforced by courts of justice."

The remedy intended to be accomplished by the act of Congress was to shield against the danger of contract or combi-

nation by the few against the interest of the many and to the detriment of freedom. The construction now given, I think, strikes down the interest of the many to the advantage and benefit of the few. It has been held in a case involving a combination among workingmen, that such combinations are embraced in the act of Congress in question, and this view was not doubted by this court. *In re Debs*, 64 Fed. Rep. 724, 745–755; 158 U. S. 564. The interpretation of the statute, therefore, which holds that reasonable agreements are within its purview, makes it embrace every peaceable organization or combination of the laborer to benefit his condition either by obtaining an increase of wages or diminution of the hours of labor. Combinations among labor for this purpose were treated as illegal under the construction of the law which included reasonable contracts within the doctrine of the invalidity of contract or combinations in restraint of trade, and they were only held not to be embraced within that doctrine either by statutory exemption therefrom or by the progress which made reason the controlling factor on the subject. It follows that the construction which reads the rule of reason out of the statute embraces within its inhibition every contract or combination by which workingmen seek to peaceably better their condition. It is therefore, as I see it, absolutely true to say that the construction now adopted which works out such results not only frustrates the plain purpose intended to be accomplished by Congress, but also makes the statute tend to an end never contemplated, and against the accomplishment of which its provisions were enacted.

But conceding for the sake of argument that the words "every contract in restraint of trade," as used in the act of Congress in question, prohibits all such contracts however reasonable they may be, and therefore that all that great body of contracts which are commonly entered into between individuals or corporations and which promote and develop trade, and which have been heretofore considered as lawful, are no longer such; and conceding also that agreements entered into by associations of workingmen to peaceably better their condition either by obtaining an increase or preventing a decrease

of wages, or by securing a reduction in the hours of labor, or for mutually protecting each other from unjust discharge, or for other reasonable purposes, have become unlawful, it remains to consider whether the provisions of the act of 1890 were intended to apply to agreements made between carriers for the purpose of classifying the freight to be by them carried, or preventing secret cutting of the published rates; in other words, whether the terms of the statute were intended to apply to contracts between carriers entered into for the purpose of securing fairness in their dealings with each other and tending to protect the public against improper discrimination and sudden changes in rates. To answer this question involves deciding whether the act here relied upon was intended to abrogate the provisions of the act of Congress of the 4th of February, 1887, and the amendments thereto, commonly known as the Interstate Commerce Act. The question is not whether railway companies may not violate the terms of the statute of 1890 if they do acts which it forbids and punishes, but whether that statute was intended to abrogate the power of railway companies to make contracts with each other which are either expressly sanctioned by the Interstate Commerce Act or the right to make which arises by reasonable implication from the terms of that act; that is to say, not whether the act of 1890 is not operative upon all persons and corporations, but whether, being so generally operative, it was intended to forbid, as in restraint of trade, all contracts on the subjects embraced within and controlled by the interstate commerce law. The statute, commonly known as the Interstate Commerce Act, was a special act, and it was intended to regulate interstate commerce transported by railway carriers. All its provisions directly and expressly related to this subject. The act of 1890, on the contrary, is a general law, not referring specifically to carriers of interstate commerce. The rule is that a general will not be held to repeal a special statute unless there be a clear implication unavoidably resulting from the general law that it was the intention that the provisions of the general law should cover the subject-matter previously, expressly and specifically provided for by particular legislation. The doctrine on this

# 358 OCTOBER TERM, 1896.

subject is thus stated in *Ex parte Crow Dog*, 109 U. S. 556, 570:

" ' The general principle to be applied,' said Bovill, C. J., in *Thorpe* v. *Adams*, L. R. 6 C. P. 135, ' to the construction of acts of Parliament, is that a general act is not to be construed to repeal a previous particular act, unless there is some express reference to the previous legislation on the subject, or unless there is a necessary inconsistency in the two acts standing together.' ' And the reason is,' said Wood, V. C., in *Fitzgerald* v. *Champenys*, 30 L. J. N. S. Eq. 782; 2 Johns. & Hem. 31–54, ' that the legislature, having had its attention directed to a special subject, and having observed all the circumstances of the case and provided for them, does not intend by a general enactment afterward to derogate from its own act when it makes no special mention of its intention so to do.' "

These principles thus announced are treated as elementary by the text writers. Endlich on Interpretation of Statutes, § 223; Sedgwick on Statutory Construction, §§ 157, 158; Sutherland on Statutory Construction, § 157.

Does, therefore, the implication irresistibly arise that Congress intended in the act of 1890 to abrogate, in whole or in part, the provisions of the act of 1887, regulating interstate commerce? It seems to me that the nature of the two enactments clearly demonstrates that there was no such intention. The act to regulate interstate commerce expressed the purpose of Congress to deal with a complex and particular subject which, from its very nature, required special legislation. That act was the initiation of a policy by Congress looking to the development and working out of a harmonious system to regulate the highly important subject of interstate transportation.

Conceding *arguendo* that the debates which took place at the time of the passage of the act of 1890 may not be resorted to as a means of interpreting its text, yet a review of the proceedings connected with the passage of the act of July 2, 1890, through the two houses of Congress, it seems to me, leaves no room for question that the act was not designed to cover the particular subjects which had been theretofore specially regulated by provisions of the interstate commerce law.

Prior to the passage of the act of 1890, various reports had been made to Congress concerning the operations of the Interstate Commerce Act, in which the commission pointed out the desirability and necessity of contracts between railroad companies in the matter of classification, stable rates, etc. After the act of 1890 had been adopted in the Senate, it was amended in the House of Representatives so as to specifically include among the contracts declared lawful " contracts for the transportation of persons or property from one State or Territory into another." Cong. Rec. vol. 21, part 5, pp. 4099, 4144. On the return of the bill to the Senate the amendment was agreed to with the added provision that the contracts for transportation to be prohibited, "should only be such as raise the rates of transportation above what is just and reasonable." Ib. 4753. The House refused to concur in the Senate amendment. A conference committee was appointed by both bodies, which recommended that the House of Representatives recede from its disagreement to the amendments of the Senate and agree to the same, modified by the addition of the provision that " nothing in this act shall be deemed or held to impair the powers of the several States in respect to any of the matters in this act mentioned." In a statement accompanying the report, Mr. Stewart, for the conferees on the part of the House, said :

"A majority of the committee of conference on the part of the House on the disagreeing votes of the two houses on Senate bill one, submit the following statement:

"In the original bill two things were declared illegal, namely: contracts in restraint of interstate trade or commerce, and the monopolization of such trade.

"Its only object was the control of trusts, so called, so far as such combinations in their relation to interstate trade are within reach of Federal legislation.

"The House amendment extends the scope of the act to all agreements entered into for the purpose of preventing competition, either in the purchase or sale of commodities, or in the transportation of persons or property within the jurisdiction of Congress.

" It declares illegal any agreement for relief from the effects of competition in the two industries of transportation and merchandising, however excessive or destructive such competition may be.

" The amendment reported by the conferees is the Senate amendment with the added proviso that the power of the States over the subjects embraced in the act shall not be impaired thereby.

" It strikes from the House amendment the clause relating to contracts for the purchase of merchandise, and modifies the transportation clause by making unlawful agreements which raise rates above what is just and reasonable." Cong. Rec. vol. 21, part 6, p. 5950.

The House rejected the report of the conference committee and adhered to its amendments. A new conference committee was appointed, and the recommendation of that committee that both houses recede was concurred in, and the bill as it originally passed the Senate was adopted. Cong. Rec. vol. 21, part 9, p. 6212.

It thus appears that the bill was originally introduced in the form in which it now appears; that this form was thought not to be sufficient to embrace railroad transportation, and that a determined effort was made by the proposed amendment to include such contracts, and that the effort was unsuccessful. The reports to Congress by the commission and by the conference committee being facts proper to be noticed in seeking to ascertain the intention of Congress, *Church of Holy Trinity* v. *United States*, 143 U. S. 457, it would seem to be manifest therefrom that there was no intention by the act to interfere with the control and regulation of railroads under the Interstate Commerce Act or with acts of the companies which had therefore been recognized as in conformity to and not in conflict with that act.

That there was and could have been no intention to repeal by the act of 1890 the earlier " act to regulate interstate commerce " is additionally evidenced by the fact that no reference is made in the later act to the prior one, and that no language is contained in the act of 1890 which could in any way be con-

strued as abrogating any of the rights conferred or powers called into existence by the Interstate Commerce Act. Nowhere, contemporaneous with the act of 1890, is there anything indicating that any one supposed that the provisions of that act were intended to repeal the Interstate Commerce Act. The understanding of Congress in this respect is shown by the circumstance that the Interstate Commerce Act has been amended in material particulars and treated as existing since the adoption of the act of 1890; and this conception of the legislative department of the Government has also been that entertained by the executive and judicial departments, evidenced by the appointment of new members of the commission, and by decisions of the courts enforcing various provisions of that act, and treating it as still subsisting in its entirety. The two laws then coexisting — is the agreement of the carriers to secure a uniform classification of freight and to prevent secret changes of the published rates, in other words, to secure just and fair dealings between each other, sanctioned by the act to regulate interstate commerce, and, therefore, not within the inhibition of the act of 1890 ?

The Interstate Commerce Act provided for the appointment of a commission to whom was to be confided the supervision of the execution of the law. Without going into detailed mention of the provisions of the statute, I adopt and quote the summary statement of the leading features of the original act contained in the first annual report made to Congress by the commission, as required by the act. It is as follows :

" All charges made for services by carriers subject to the act must be reasonable and just. Every unjust and unreasonable charge is prohibited and declared to be unlawful.

" The direct or indirect charging, demanding, collecting or receiving for any service rendered a greater or less compensation from any one or more persons than from any other for a like and contemporaneous service, is declared to be unjust discrimination and is prohibited.

" The giving of any undue or unreasonable preferences, as between persons or localities, or kinds of traffic, or the subject-

ing any one of them to undue or unreasonable prejudice or disadvantage, is declared to be unlawful.

" Reasonable, proper and equal facilities for the interchange of traffic between lines, and for the receiving, forwarding and delivering of passengers and property between connecting lines is required, and discrimination in rates and charges as between connecting lines is forbidden.

" It is made unlawful to charge or receive any greater compensation in the aggregate for the transportation of passengers or the like kind of property under substantially similar circumstances and conditions for a shorter than for a longer distance over the same line in the same direction, the shorter being included within the longer distance.

" Contracts, agreements or combinations for the pooling of freights of different and competing railroads, or for dividing between them the aggregate or net earnings of such railroads or any portion thereof, are declared to be unlawful.

" All carriers subject to the law are required to print their tariffs for the transportation of persons and property, and to keep them for public inspection at every depot or station on their roads. An advance in rates is not to be made until after ten days' public notice, but a reduction in rates may be made to take effect at once, the notice of the same being immediately and publicly given. The rates publicly notified are to be the maximum as well as the minimum charges which can be collected or received for the services respectively for which they purport to be established.

" Copies of all tariffs are required to be filed with this commission, which is also to be promptly notified of all changes that shall be made in the same. The joint tariffs of connecting roads are also required to be filed, and also copies of all contracts, agreements or arrangements between carriers in relation to traffic affected by the act.

" It is made unlawful for any carrier to enter into any combination, contract or agreement, expressed or implied, to prevent, by change of time schedules, carriage in different cars, or by other means or devices, the carriage of freights from being continuous from the place of shipment to the place of destination."

These provisions substantially exist in the act. as now in force, except that by an amendment made March 2, 1889, it was provided that rates should not be reduced by carriers except upon three days' public notice of an intention so to do.

This summary of the act, which omits reference to a number of its provisions relating to the power of the commission and the mode in which these powers are to be exercised, will suffice for an examination of the matter in hand.

Now, a consideration of the terms of the statute, I submit, makes it clear that the contract here sought to be avoided as illegal is either directly sanctioned or impliedly authorized thereby. That the act did not contemplate that the relations of the carrier should be confined to his own line and to business going over such line alone, is conclusively shown by the fact that the act specifically provides for joint and continuous lines; in other words, for agreements between several roads to compose a joint line. That these agreements are to arise from contract is also shown by the fact that the law provides for the filing of such contracts with the commission. And it was also contemplated that the agreements should cover joint rates, since it provides for the making of such joint tariffs and for their publication and filing with the commission. The making of a tariff of this character includes necessarily agreements for the classification of freight, as the freight classification is the essential element in the making up of a rate. That the interstate commerce rates, all of which are controlled by the provisions as to reasonableness, were not intended to fluctuate hourly and daily as competition might ebb and flow, results from the fact that the published rates could not either be increased or reduced, except after a specified time. It follows, then, that agreements as to reasonable rates and against their secret reduction conform exactly to the terms of the act. Indeed, the authority to make agreements on this subject not only results from the terms of the act just referred to, but from its mandatory provisions forbidding discrimination against or preference to persons and places. The argument that these provisions referred to joint lines alone and not to competitive lines is without force; since joint rates necessarily relate to and

are influenced by the rates on competitive lines.    To illustrate, suppose three joint lines of railroads between Chicago and New York, each made up of many roads.    How could a joint rate be agreed on by the roads composing one of these continuous lines, without an ascertainment of the rate existing on the other continuous line?    What contract could be made with safety for transportation over one of the lines without taking into account the rate of all the others?    There certainly could be no prevention of unjust discrimination as to the persons and places within a given territory, unless the rates of all competing lines within the territory be considered and the sudden change of the published rates of all such lines be guarded against.

I do not further elaborate the reasons demonstrating that classification is essential to rate making, and that a joint rate to be feasible must consider the competitive rates in the same territory, since these propositions are to me self-evident, and their correctness is substantiated by statements found in the reports of the Interstate Commerce Commission to Congress, of which reports judicial notice may be taken.    *Heath* v. *Wallace*, 138 U. S. 573, 584.

. I excerpt from some of these reports of the commission to Congress statements bearing on these subjects, as well as other statements indicating that agreements among carriers, competitive as well as connecting, for the purpose of securing a uniform classification and preventing of undercutting of rates, underbilling, etc., existed prior to the Interstate Commerce Act, were continued thereafter, and were deemed not to be forbidden by law, but, on the contrary, were considered as instruments tending to secure its successful evolution.    Whilst it is doubtless true that in a recent report the commission, as now constituted, has said that agreements between competitors to prevent the undercutting of rates may operate to cause carriers to disregard the lawful orders of the commission, this fact does not change the legal inference to be deduced from the construction placed upon the law by those charged with its administration in the period immediately following its adoption and which was then reported to Congress.

On the subject of relative rates, the commission at page 39 of their first. annual report said: "Questions of rates on one line or at one point cannot be considered by themselves exclusively; a change in them may affect rates in a considerable part of the country. . . . Just rates are always relative; the act itself provides for its being so when it forbids unjust discrimination as between localities." That is to say, if one continuous line made joint rates and fixed and published them, and the other then made a different rate, not only would the first joint rate be injurious to the interests of the railroads making it, during the period in which it could not be changed, but would also be against the interests of the public and of those who had contracted to ship, since it would create among shippers and the receivers that inequality which it was the express purpose of the act to prevent.

In the same report of the commission, at page 33, not only the expediency but the necessity of contractual relations between railroad companies is pointed out in the following language:

"To make railroads of the greatest possible service to the country, contract relations would be essential, because there would need to be joint tariffs, joint running arrangements, an interchange of cars and a giving of credit to a large extent, some of which were obviously beyond the reach of compulsory legislation, and even if they were not, could be best settled and all the incidents and qualifications fixed by the voluntary action of the parties in control of the roads respectively."

Also at page 35, after referring to the fact that the former railroad associations had been continued in existence since the enactment of the interstate commerce law, though pooling had been prohibited, among other objects, for the "making of regulations for uninterrupted and harmonious railroad communication and exchange of traffic within the territories embraced by their workings," the commission observed that "some regulations in addition to those made by the law are almost if not altogether indispensable."

On the same page the fact is emphasized that classification had not been taken, by the act, out of the hands of the carriers,

and it was observed that classification was best made by the
joint action of the railroads themselves.   In its second annual
report the commission, in commenting upon the evils arising
from the want of friendly business relations between railroads
and the injury that a short road might cause by simply ab-
staining from extending accommodation that could not be
lawfully forced from it, said (p. 28):

" The public has an interest in being protected against the
probable exercise of any such power.   But its interest goes
further than this; it goes to the establishment of such relations
among the managers of roads as will lead to the extension of
their traffic arrangements with mutual responsibility, just as
far as may be possible, so that the public may have in the ser-
vice performed all the benefits and conveniences that might
be expected to follow from general federation.   There is
nothing in the existence of such arrangements which is at all
inconsistent with earnest competition.   They are of general
convenience to the carriers, as well as to the public, and their
voluntary extension may be looked for until in the strife
between the roads the limits of competition are passed and
warfare is entered upon.   But in order to form them great
mutual concessions are often indispensable, and such conces-
sions are likely to be made when relations are friendly, but
are not to be looked for when hostile relations have been
inaugurated."

At page 29 of the report the existence of traffic arrange-
ments between railroads is called to the attention of Congress
in the following language:

" While the commission is not at this time prepared to
recommend general legislation towards the establishment and
promotion of relations between the carriers that shall better
subserve the public interest than those that are now common,
it must nevertheless look forward to the possibility of some-
thing of that nature becoming at some time imperative, unless
a great improvement in the existing condition of things is
voluntarily inaugurated."

So, also, the existence of traffic associations, between com-
petitive roads, for purposes recognized by the act as lawful,

and their favorable tendency seems to be conceded in the fourth annual report of the commissioners, where, at page 29, it is said:

"If the regulations which are established by the railroad associations were uniformly, or even generally, observed by their members, respectively, there would be little difficulty in enforcing a rule of reasonable rates, for the competition between the roads which even then would exist would be such as would prevent the establishment of rates which are altogether unreasonable, and the public would not be likely to complain if they were satisfied that the rate sheets were observed."

The character of associations such as that under consideration is alluded to at page 26 of the same report, where, in discussing the subject of how best to secure a unity of railroad interests, it was observed " without legislation to favor it little can be done beyond the formation of consulting and advisory associations, and the work of these is not only necessarily defective, but it is also limited to a circumscribed territory."

The significance of the statement that to obtain uniformity of classification, a result most desirable for the best interests of the public, agreements between the railroads themselves was essential, is apparent from the fact, frequently declared by the commission in its reports, that uniformity of classification is one of the prerequisites of uniformity of rates. 1 Ann. Rep. 30, 35; 2 Ann. Rep. 40; 3 Ann. Rep. 51, 52; 4 Ann. Rep. 32. The very great importance of uniform and stable rates has also frequently been reiterated in the reports of the commission. Thus, at page 6 of the first annual report, in reviewing the causes which led to the adoption of the Interstate Commerce Act, it is said:

"Permanence of rates was also seen to be of very high importance to every man engaged in business enterprises, since without it business contracts were lottery ventures. It was also perceived that the absolute sum of the money charges exacted for transportation, if not clearly beyond the bounds of reason, was of inferior importance in comparison with the obtaining of rates that should be open, equal, relatively just

OCTOBER TERM, 1896.

as between places and as steady as in the nature of things was practicable."

That unstable rates between competing carriers lead to injurious discrimination, one of the evils sought to be remedied by the act, was mentioned in the same report at pages 36 and 37, in connection with a discussion of the subject of reasonable charges, in the following language:

"Among the reasons most frequently operating to cause complaints of rates may be mentioned: the want of steadiness in rates. . . . More often, perhaps, growing out of disagreements between competing companies, which, when they become serious, may result in wars of rates between them. Wars of rates, when mutual injury is the chief purpose in view, as is sometimes the case, are not only mischievous in their immediate effects upon the parties to them, and upon the business community whose calculations and plans must for a time be disturbed, but they have a permanently injurious influence upon the railroad service because of their effect upon the public mind."

The evil effects of shifting rates was also treated of at page 22 of the second annual report, where the commission inserted a letter received from a business man of Kansas City, not connected with railroads, who said:

"The frequent and violent changes in railway rates which have taken place during the past few years, and which seem likely to be unabated, seems to me to call for new legislation in the way of amendment of the interstate commerce bill. These changes are ruinous to all business men, as well as the railways, and are the cause of great discontent among shippers everywhere, and especially to the farmers. What is needed is a fixed permanent rate, which shall be reasonable, and which can be counted upon by any one engaging in business."

So, also, in the fourth annual report it was observed that shifting, unstable rates, by competing roads, was contrary to the purpose of the Interstate Commerce Act, and hampered the operations of the commission. It was said at page 21:

"In former reports the commission has referred to the undoubted fact that competition for business between railroad companies is often pushed to ruinous extremes, and the most serious difficulty in the way of securing obedience to the law may be traced to this fact. When competition degenerates to rate wars, they are as unsettling to the business of the country as they are mischievous to the carriers, and the spirit of existing law is against them."

In addition to the text of the law heretofore commented on, the section which forbids pooling adds cogency to the construction that the law could not have been intended to forbid contracts between carriers for the purpose of preventing the doing of those things which the law forbade. For, as I have said, it cannot be denied that at the time of the passage of the act there existed associations and contracts between carriers for other purposes than the pooling of their earnings. Whilst the exact scope of these contracts is not shown, the fact that their existence was considered by Congress results from the face of the act, since it requires that agreements and contracts between carriers shall be filed with the commission. Moreover, the earlier reports of the commission, as I have shown, refer to such traffic agreements, and state that after the passage of the act they continued to exist as they had existed before eliminating only the pooling feature.

In view of these facts, when the act *expressly forbids contracts and combinations between railroads for pooling, and makes no mention of other contracts,* it is clear that the continued existence of such contracts was contemplated, and they are not intended to be forbidden by the act. The elementary rule of *expressio unius* entirely justifies this implication.

And it is, I submit, no answer to this reasoning to say that the record does not show the terms of these contracts, since judicial notice may be taken of the reports made by the commission to Congress, from which reports the nature of the contracts is sufficiently pointed out to authorize the conclusion that they were of the general character of the one here assailed.

Whilst the excerpts from the reports of the commission which have been heretofore made, serve to elucidate the text

of the act, they also, I submit, constitute a contemporaneous construction of the provisions of the act made by the officers charged with its administration, which is entitled to very great weight. *Brown* v. *United States*, 113 U. S. 568, 571, and cases there cited.

The rule sustained by these authorities receives additional sanction here, from the fact that the construction at the time made by the commission was reported to Congress, and the act was subsequently amended by that body without any repudiation of such construction.

It is, I submit, therefore not to be denied that the agreement between the carriers, the validity of which is here drawn in question, seeking to secure uniform classification and to prevent the undercutting of the published rates, even though such agreements be made with competing as well as joint lines, is in accord with the plain text of the Interstate Commerce Act, and is in harmony with the views of the purposes of that law contemporaneously expressed to Congress by the body immediately charged with its administration, and tacitly approved by Congress.

But, departing from a consideration of the mere text and looking at the Interstate Commerce Act from a broader aspect, in order to discover the intention of the lawmaker and to discern the evils which it was intended to suppress and the remedies which it was proposed to afford by its enactment, it seems to me very clear that the contract in question is in accord with the act and should not be avoided.

It cannot be questioned that the Interstate Commerce Act was intended by Congress to inaugurate a new policy for the purpose of reasonably controlling interstate commerce rates and the dealings of carriers with reference to such rates. Two systems were necessarily presented: the one a prohibition against the exaction of all unreasonable rates and subject to this restriction, allowing the hourly and daily play of untrammelled competition, resulting in inequality and discrimination; the other imposing a like duty as to reasonable rates, and whilst allowing competition subject to this limitation, preventing the injurious consequences arising from a

constant and daily change of rates between connecting or competing lines, thus avoiding discrimination and preference as to persons and places.

The second of these systems is, I submit, plainly the one embodied in the Interstate Commerce Act. At the outset reasonable rates are exacted, and the power to strike down rates which are unreasonable is provided. In the subsequent provisions discrimination against persons and against places to arise from daily fluctuation in rates is guarded against by requiring publication of rates and forbidding changes of the published rates, whether by way of increase or reduction during a limited time. To hold, then, the contract under consideration to be invalid when it simply provides for uniform classification, and seeks to prevent secret or sudden changes in the published rates, would be to avoid a contract covered by the law and embodied in its policy. It cannot, I think, be correctly said that whilst the avowed purpose of the contract in question embraced only the foregoing objects, its ulterior intent was to bring about results in conflict with the interstate commerce law. The answers to the bill of complaint specially denied the allegations as to the improper motives of the parties to the contract, and also expressly averred their lawful and innocent intention. As the case was heard upon bill and answer, improper motives cannot therefore be imputed. Indeed, the opinion of the court sustains this view, since it eliminates all consideration of improper motives and holds that the validity of the contract must depend upon its face, and deduces as a legal conclusion from this premise that the contract is invalid, because even reasonable contracts are embraced within the purview of the act of 1890. To my mind, the judicial declaration that carriers cannot agree among themselves for the purpose of aiding in the enforcement of the provisions of the interstate commerce law, will strike a blow at the beneficial results of that act, and will have a direct tendency to produce the preferences and discriminations which it was one of the main objects of the act to frustrate. The great complexity of the subject, the numerous interests concerned in it, the vast area over which it

operates, present difficulties enough without, it seems to me, its being advisable to add to them by holding that a contract which is supported by the text of the law is invalid, because, although it is reasonable and just, it must be considered as in restraint of trade.

Nor, do I think that the danger of these evil consequences is avoided by the statement that if the contract be annulled, these dangers will not arise, because experience shows that contracts such as that here in question, when entered into by railroads, are never observed, and therefore it is just as though the contract did not exist. How, may I ask, can judicial notice be taken of this fact, when it is said that judicial notice cannot be taken of the fact that there are such contracts? How, moreover, may I ask, can it be said on one branch of the case that the contract, although reasonable, must be avoided, because it is a contract in restraint of trade, and then on the other branch declared that contracts of that character never do restrain trade because they are never carried out between the parties who enter into them?

There is another contention which, I submit, is also unsound, that is the suggestion that it is impossible to say that there can be such a thing as a reasonable contract between railroads seeking to avoid sudden or secret changes in reasonable rates because the question of railroad rates is so complex and is involved in so much difficulty that to say that a rate is reasonable is equivalent to saying that it must be fixed by the railroads themselves, as no mind outside of the officials of the particular roads can determine whether a rate is reasonable or not. But this proposition absolutely conflicts with the methods of dealing with railroad rates adopted in England and expressly put in force by Congress in the Interstate Commerce Act and by many of the States of the Union. For years, the rule in England was reasonable rates enforced by judicial power, and subsequently by enactment securing such reasonable rates by administrative authority. The Interstate Commerce Act especially provides for reasonable rates, and vests primarily in the commission, and then in the courts the power to enforce the provision and like machinery is provided

in many of the States. Will it be said that Congress and other legislative bodies have provided for reasonable rates and created the machinery to enforce them, when whether rates are reasonable or not is impossible of ascertainment? If this proposition be correct, what, may I ask, becomes of the judgment of this court in *Cincinnati, New Orleans &c. Railway Co.* v. *Interstate Commerce Commission*, 162 U. S. 184, where it is held that the order of the commission finding certain rates charged by a railroad to be unreasonable was correct?

In conclusion, I notice briefly the proposition that though it be admitted that contracts, when made by individuals or private corporations, when reasonable, will not be considered as in restraint of trade, yet such is not the case as to public corporations, because any contract made by them in any measure in restraint of trade, even when reasonable, is presumptively injurious to the public interests, and therefore invalid. The fallacy in this proposition consists in overlooking the distinction between acts of a public corporation which are *ultra vires* and those which are not. If the contract of such a corporation which is assailed be *ultra vires*, of course the question of reasonableness becomes irrelevant, since the charter is the reason of the being of the corporation. The doctrine is predicated on the following expressions taken from the opinion of the court expressed by Mr. Chief Justice Fuller in *Gibbs* v. *Baltimore Gas Co.*, 130 U. S. 396, 408:

" That in the instance of business of such a character that it presumably cannot be restrained to any extent whatever without prejudice to the public interests, courts decline to enforce or sustain contracts imposing such restraint, however partial, because in contravention of public policy. This subject is much considered, and the authorities cited in *West Virginia Transportation Co.* v. *Ohio River Pipe Line Co.*, 22 West Va. 600; *Chicago &c. Gas Co.* v. *People's Gas Co.*, 121 Illinois, 530; *Western Union Telegraph Co.* v. *American Union Telegraph Co.*, 65 Georgia, 160."

But, manifestly, this language must be construed with reference to the facts of the case in which it was used. What the facts were in that case is shown by the statement in the

opinion (p. 406) that the contract there considered "was an, agreement for the abandonment by one of the companies of the discharge of its duties to the public." It is also to be remembered that it was this character of contract, that is, one which was *ultra vires*, which was held to be illegal in the West Virginia, Illinois and Georgia cases, which were cited in the *Gibbs case* in support of the excerpt just quoted. That the language in the *Gibbs case* referred to conditions of fact like that there passed upon, that is, contracts *ultra vires*, is shown by the subsequent case of *Chicago &c. Railway Co.* v. *Pullman Car Co.*, 139 U. S. 79, where a contract of the rail-way company was assailed as in restraint of trade, and the court held that although by the contract the company had restrained itself for a long period of years from using other than certain drawing room and sleeping cars, the contract was yet a valid and proper contract. Manifestly, this decision is utterly irreconcilable with the view that in the case of a rail-road company, every restraint imposed by contract upon its freedom of action is necessarily injurious to the public inter-ests, and hence invalid. Indeed, the proposition that any restraint of its conduct which a railroad may create by con-tract is invalid, because such road is a public corporation, is demonstrated to be erroneous by the Interstate Commerce Act, which, in the provisions heretofore referred to, not only ex-pressly authorizes, but in some instances, commands agree-ments from which restraint of the action of the corporation necessarily arises.

I am authorized to say that MR. JUSTICE FIELD, MR. JUSTICE GRAY, and MR. JUSTICE SHIRAS concur in this dissent.